# Commonwealth v. Bubnis.

*Criminal law—Murder—Venue.*

The record of a conviction of murder is conclusive that the offense was committed within the county in which the indictment charges that the deed was done.

*Criminal law—Murder—Evidence—Question addressed to doctor.*

On the trial of an indictment for murder where it appears from the evidence that an hour or two before the killing the prisoner was seen approaching the house of the deceased with an ax which he at first tried to conceal, but subsequently flourished in a violent manner, it is not improper to ask a doctor on the witness stand whether or not a hatchet or an ax would have produced such a wound as he had discovered on the head of the deceased.

*Criminal law—Murder—Evidence—Credibility of witness.*

On the trial of an indictment for murder where a witness has testified in his examination in chief as to the crime with conciseness and clearness,

it is proper to exclude questions on cross-examination relating to matters which do not affect his credibility, as showing motive or feeling for swearing falsely against the accused, although such examination might have been proper on the question of motive if the witness himself had been on trial.

*Criminal law—Murder—Evidence—Declarations of confederates.*

Where the prisoner was surrounded by his confederates at the time of the killing, declarations of confederates made in the prisoner's presence immediately prior to the killing, are evidence against the prisoner.

*Criminal law—Murder—Appeals—Harmless error—Charge.*

The Supreme Court will not reverse a conviction of murder of the first degree because the trial judge did not accurately state the testimony, where it appears that the portion of the charge complained of related to immaterial matters, and did no injustice to the prisoner.

Assignments of error as to alleged misstatements in the charge will not be sustained, where it appears that the portions of the charge complained of, were simply statements by the trial judge of what was the theory or contention of the commonwealth, and that the jury must have so understood what was said.

*Criminal law—Murder—Speech of district attorney.*

A strong statement of the commonwealth's position by the district attorney is not a ground for reversing a conviction of murder, where the record shows that when the trial judge's attention was called to the objectionable language he said : " Both counsel state their position from different standpoints ; it is for the jury to pass upon whether the statements of defendant's counsel or the statements of the district attorney are in accordance with the evidence."

In his official capacity, clothed with the gravest responsibilities, and exercising functions in a measure judicial, the district attorney should ever be cautious in expressing to a jury his belief in the guilt of the accused. If convinced of it, his duty is to lead them to his own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other conclusion.  Per BROWN, J.

Argued Oct. 8, 1900.  Appeal, No. 236, Jan. T., 1900, by defendant, from judgment of O. & T. Schuylkill Co., Nov. T., 1899, No. 1147, on verdict of guilty of murder in the first degree in case of Commonwealth v. Rollis Bubnis.  Before McCOLLUM, C. J., MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ.  Affirmed.

Indictment for murder.

At the trial the evidence tended to show that on Sunday, September 24, 1899, at about 7 o'clock in the evening, Joseph Rutskowski was struck on the head by an ax, and that the blow was struck by the prisoner.  It appeared that the prisoner was

identified with a faction known as the Propreonokus, and that the deceased was a member of a hostile faction known as the Zukus. Eleven members of the Propreonokus, including the prisoner, were jointly indicted for the crime. The evidence showed that immediately before the killing, these men, in the presence and the hearing of each other and of the prisoner, had made threats against the deceased. About an hour before the killing, the prisoner was seen to have an ax in his possession, which he at first attempted to conceal under his coat, but subsequently flourished in a violent manner. When Dr. Davis was on the stand he was asked this question:

" Q. State whether or not a hatchet or an ax would produce such a wound as you discovered on this man's head."

Objected to because it suggests to the witness an instrument, which is highly improper and incompetent. Admitted. Defendant excepts. Bill sealed. [2]

Frank Douches, on cross-examination, was asked this question: " Do you know that the Stenkiewiczs who were boarding at Rutskowski's left on account of a difficulty that you had with Rutskowski?"

Mr. Bechtel: Objected to as irrelevant, immaterial and incompetent, and not cross-examination.

The Court: As the question stands now it is not cross-examination, and we sustain the objection. Defendant excepts. Bill sealed. [3]

" Q. Did not Rutskowski accuse you, in the presence of three men, of a heinous offense against his wife?"

Mr. Bechtel: Objected to as irrelevant, incompetent, immaterial and not cross-examination.

The Court: The objection is sustained to the question in the form in which it is put. Defendant excepts. Bill sealed. [4]

" Q. Are you not going to get married to Mrs. Rutskowski?"

Mr. Bechtel: Objected to as incompetent, irrelevant and immaterial.

The Court: We sustain the objection. We do not see that it is material whether or not he is going to marry the widow. We know of no law prohibiting it. Defendant excepts. Bill sealed. [5]

Counsel for the commonwealth asked the witness:

"Q. Did you hear Andrew Coras say anything just before

the blow was struck, and whilst he was in company with these two defendants?"

Mr. Seltzer: Objected to as incompetent and immaterial what Andrew Coras said; that he is not on trial here, and these defendants are not responsible for the declarations of Andrew Coras. Furthermore, the witness has already declared he heard nothing; that he heard talking among themselves, but did not hear it; they did not talk loud enough. They cannot contradict their own witness.

The Court: We permit the question. Defendants except. Bill sealed. [6]

Eva Sincavage was asked under objection: "State whether or not you heard Anthony Machulis say anything in reference to the Zukus?" Defendant excepts. Bill sealed. [7]

The witness Majika was asked this question: "Every witness in this case that has testified at all to the killing, or the time when the blow was struck, has established the time as between 7 and 8 o'clock. Do you now swear to this jury that you were within thirty or forty feet of where a man was struck down in cold blood, and you did not know anything of it until the next day when you were coming home from work?" Question allowed. [9]

Frank Shappell, was asked this question: "Do you not know it to be a fact that this piece of testimony that you have here given in court is false, and that it was given for the express purpose of counteracting the fact testified to by Mrs. Jane Grow, that the party that struck the match had a white hat, and for no other purpose whatever?" Question allowed. [10]

The court charged in part as follows.

[He (Machulis) heard him (referring to Rollis Bubnis) talk to Frank Wylonis, saying that they would make sausage of him.] [11]

[That during the 24th of September threats were made by Rollis and others in the hearing and presence of Matt as to the killing of Zukus, as to making bologna, as to filling the streets with bologna, and threats as to meat being cheap, and other threats of the same or a similar character made by these defendants or their companions, in the presence and hearing of these defendants, all of whom were together that afternoon

from the time they left Benders until they reached Blazes later in the day.] [13]

[That the next day when Rollis was arrested by the constable and charged with the crime, he manifested no surprise and did not deny the charge; and again at the Shenandoah lockup spoke of the crime without denying or disclaiming any connection with or responsibility for it; and from these alleged facts the commonwealth's officers claim that Rollis Bubnis struck the blow, and that Matt aided and counseled by his presence and advice before the blow was struck, and that therefore he and Matt are equally guilty as if he had struck the blow.] [14]

The district attorney in his speech to the jury used the following language:

" I say now when I debate the first proposition in this case, that Rollis Bubnis is guilty of murder in the first degree, and I shall prove it to you beyond any peradventure of a doubt."

Mr. Seltzer: The district attorney having stated to the jury as a positive declaration that Rollis Bubnis is guilty of murder in the first degree, I now move that the jury be discharged.

The Court: Which motion is refused.

Defendant excepts. Bill sealed. [15]

Verdict of guilty of murder of the first degree, upon which judgment of sentence was passed.

*Errors assigned* were (1) that the judgment and sentence should be arrested, and the verdict set aside for want of jurisdiction as no venue of the crime charged had been proved; (2–7, 9, 10) rulings on evidence as above; (11–14) portions of charge as above; (15) ruling as to the district attorney's speech; (17) that a verdict of murder in the first degree was not warranted; (18) that the charge of the court was inadequate, and too unfavorable to defendant.

*W. D. Seltzer*, for appellant.—Where the record fails to show that the offense charged was committed in the county where the venue is laid, judgment must be reversed.

Misstatements in the charge are grounds for reversal: Com. v. Swayne, 1 Pa. Superior Ct. 547; Com. v. Stauffer, 12 Lanc. Law Rev. 361.

The district attorney exceeded his authority, and influenced the jury by his remarks, to the prejudice of the defendant: Com. v. Smith, 10 Phila. 189; Com. v. Bruner, 1 Dist. Rep. 141; Com. v. Nicely, 130 Pa. 270; Holden v. Penna. R. Co., 169 Pa. 1; Com. v. Windish, 176 Pa. 167; Com. v. Weber, 36 W. N. C. 193; Lane v. Com., 59 Pa. 371.

*Edgar W. Bechtel*, with him *M. P. McLoughlin*, district attorney, and *W. J. Whitehouse*, for appellee.

Opinion by Mr. Justice Brown, January 7, 1901:

By the first assignment of error we are asked to reverse the judgment of the court below because the venue as laid was not proved. The indictment upon which the defendant was convicted of murder of the first degree, charged the commission of the offense in Schuylkill county, and we might dismiss this assignment for the reason that the conviction is conclusive that the crime charged was there committed: Com. v. Gurley, 45 Pa. 392. But the contention of the appellant, that the venue as laid was not proved, is not sustained by an examination of the testimony; it was proved as laid. Ducias, the commonwealth's witness to the prisoner's crime, testified, on January 1, 1900, that he was then living at William Penn, and had carried the dying victim from the gate, where the blow was struck, into the house, in which his death shortly afterwards followed, and that, at that time, he was boarding with Rutskowski, the deceased. Mrs. Rutskowski testified that William Penn was in Schuylkill county. But it is urged by counsel for appellant, zealously and technically pressing this appeal, that Ducias simply testified that, at the time of the trial, he was living at William Penn, and that "the record is silent" as to where he resided on September 24, 1899, the date of the commission of the crime. Between the trial and the preparation of the paper-book, it was, however, forgotten that this same witness, in reply to a question asked by the prisoner's counsel, stated that his home, on the day he testified, had been his home for thirteen months preceding, and that the same house in which he was then boarding with the widow of the deceased had been his residence when her husband was killed. This first assignment, which, on the argument, seemed to be the chief reliance of the appellant, is, therefore, overruled.

Dr. Davis, a witness for the commonwealth, after describing the wound on the head of the deceased, was asked the following question, which is the subject of the second assignment: "State whether or not a hatchet or an ax would produce such a wound as you discovered on this man's head." This question, in the alternative, was properly asked by the commonwealth in view of the testimony about to follow, that the prisoner, an hour or two before he struck the blow, was seen going in the direction of the home of the deceased, carrying an ax, which he tried to conceal under his coat, and shortly afterwards flourished with violent demonstration in the presence of those jointly indicted with him for the murder charged. Besides, on cross-examination, the widest latitude was allowed the prisoner's counsel to show that the wound might have been produced by some other instrument, and no possible harm was done the accused in allowing the question.

The third, fourth and fifth assignments can be disposed of together. They relate to the refusal of the court to allow the following questions to be put to Ducias in his cross-examination by the defense: "Do you know that the Stenkiewiczs, who were boarding at Rutskowski's, left on account of a difficulty that you had with Rutskowski?" "Did not Rutskowski accuse you in the presence of three men, of a heinous offense against his wife?" "Are you not going to get married to Mrs. Rutskowski?" The first question was disallowed as not being cross-examination, and all ought to have been refused as irrelevant and immaterial. A reason urged upon us why they should have been allowed is that, if the witness had been on trial for the crime charged, they would have been proper on the question of motive; but the witness was not on trial. He was called to testify against the accused, and nothing in these overruled offers relates to his material examination in chief, or tends to show feeling affecting his credibility as a witness. His testimony in chief as to the crime was concise and clear, and the excluded offers would not justly have affected his credibility as showing motives or feeling for swearing falsely against the accused. If he had any motive or feeling inducing him to swear falsely, the proper questions could have been asked, and an inspection of the record shows that the commonwealth would not have objected; but to have allowed the excluded offers

might have been to allow the weight of his testimony to be impaired by wholly immaterial and irrelevant matters, unless the jury were of exceptional intelligence and discrimination.

We are told by counsel for appellant that the sixth and seventh assignments are too plain for argument, and nothing has been given to us in support of them. It is plain that they are without merit. Coras and Machulis were indicted jointly with Bubnis, and what was said by them in his presence immediately before the blow was struck, was manifestly proper. He was, according to the testimony, surrounded by his confederates in the crime, and what they then said was evidence of the intent of the confederation, even if it was actually carried out only by himself. The deceased belonged to the Zukus, hated by the Propreonokus, and threats made generally against them by Machulis, in the presence of Bubnis—both of the latter clan— were evidence of malice on the part of the crowd of which the prisoner was an active member ; but, as the witness said she heard nothing said by Machulis about the Zukus, no wrong was done in allowing the question which is the subject of the seventh assignment.

The eighth assignment is a misstatement of facts, perhaps inadvertently made. The testimony referred to in it was not read to the witnesses. Their attention was called to it for the very proper purpose of testing their recollection of what they had seen. The same may be said of the purpose of the question called to our attention by the ninth assignment. The question put to Shappell was not improper. An examination of his testimony has satisfied us he was not too rigorously cross-examined and that the commonwealth was justified in asking the question complained of. The tenth assignment is not sustained.

In considering the eleventh, twelfth, thirteenth and fourteenth assignments, we have very carefully reviewed the charge of the court below. Those portions of it brought to our attention by the first two of said assignments, though not accurate statements of the testimony, related to immaterial matters and did no injustice to the prisoner. The errors complained of in the thirteenth and fourteenth assignments are alleged misstatements of the testimony by the learned judge in his charge to the jury. Though these assignments specifically allege mis-

statements by the court, and contain extracts from the charge to show that they were made, we find from an examination of it that the quotations are simply a statement by the court of what was the theory or contention of the commonwealth, and the jury must have so understood what was said. These two assignments, which should not have been filed, are summarily dismissed.

The sixth point presented by the defendant related to a question of fact, and it was properly answered by telling the jury that they were to pass upon and determine the credibility of the witnesses, and that their verdict should depend not only upon the facts set forth in the point, but upon all the evidence in the case.

The language of the district attorney, excepted to by the appellant and made the subject of the sixteenth assignment, was a statement to the jury of the position taken by the commonwealth. We are not prepared to say that this language standing alone, would be just cause for disturbing the judgment before us, and it certainly is not, when we turn to the record and find, that, the attention of the trial judge having been called to it, he said, "Both counsel state their position from different standpoints, that it is for the jury to pass upon whether the statements of defendant's counsel or the statements of the district attorney are in accordance with the evidence." These words of the court made harmless those uttered by the commonwealth's officer. It may be proper for us to say in this connection that, in his official capacity, clothed with the gravest responsibilities, and exercising functions in a measure judicial, the district attorney should ever be cautious in expressing to a jury his belief in the guilt of the accused. If convinced of it, his duty is to lead them to his own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other conclusion. "The district attorney is a quasi-judicial officer. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions

from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan:" Com. v. Nicely, 130 Pa. 261.

Finally, in the discharge of the duty imposed upon us by the act of February 15, 1870, having reviewed the evidence and found in it "the ingredients necessary to constitute murder in the first degree," and the charge of the court below having been adequate and fair to the prisoner, as well as to the commonwealth, we are compelled to overrule the last two assignments; and, all having been overruled, we now affirm the judgment of the court below, and remit the record for the purpose of execution.