396 A.2d 649

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Robert Francis WEIMER and John Edward Weimer.**

Superior Court of Pennsylvania.

Submitted Nov. 14, 1977.

Decided Dec. 28, 1978.

John J. Driscoll, Assistant District Attorney, Greensburg, for Commonwealth, appellant.

Charles E. Marker, Greensburg, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

This appeal by the Commonwealth arises from the order of the lower court suppressing evidence of certain

gambling devices and dismissing the charges against appellees.[1] For the reasons stated herein, we reverse the suppression order and remand the case for further proceedings.

The record discloses the following facts. During the early morning hours of May 21, 1976, Troopers Dominski and Deise of the Pennsylvania State Police entered the South Greensburg Hunt Club, located in South Greensburg, Westmoreland County. The visit was occasioned by certain complaints received by the police alleging that the club was harboring gambling activities. Neither trooper was in uniform at the time, nor did they possess either search or arrest warrants. The club is a private one in which admission is theoretically restricted to members; a fact known to both troopers, neither of whom were club members. The single entrance is through a locked front door activated by a buzzer system. Contained in the door is a one-way mirror which prevents those outside the building from peering into the club.[2]

On the instant occasion, the two troopers gained entrance simply by pressing the doorbell and being admitted, although they were subsequently confronted at the bar by the bartender, Robert Weimer, and questioned as to their membership.[3] Both were eventually allowed to order drinks. While standing at the bar, the troopers observed various gambling paraphernalia, including a "fish bowl", punch

1. The Commonwealth has a right to appeal the order because suppression of all evidence encompassed by it would terminate the Commonwealth's case, *Commonwealth v. Ray*, 448 Pa. 307, 292 A.2d 410 (1972); *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963); *Commonwealth v. DeFelice*, 248 Pa.Super. 516, 375 A.2d 360 (1977); *Commonwealth v. Deren*, 233 Pa.Super. 373, 337 A.2d 600 (1975). As we noted in *Deren*, failing to review the merits of the order would be "contrary to our function in this matter, which is to ascertain that all evidence received is proper and to insure that the rights of all parties are protected." *Commonwealth v. Deren, supra*, 233 Pa.Super. at 378, 337 A.2d at 602.

2. Some dispute on this point appeared in the record. Trooper Deise testified that he did not observe such a mirror.

3. The record does not detail the exact conversation between Trooper Dominski and Weimer.

board, and tip sheets. Trooper Deise then telephoned the Greensburg police barracks and requested that uniformed personnel be dispatched to the scene. Upon their arrival some forty-five minutes later, they were observed by Weimer through the one-way mirror. After he failed to allow them entry, Trooper Deise identified himself, advised Weimer that an arrest was to be made, and opened the door for the uniformed officers. Robert Weimer then telephoned John Weimer, his father and president of the club, and requested that he come to the premises. On the latter's arrival, he was arrested for possession of gambling devices,[4] and certain evidence was confiscated.

Subsequently, the state police again received anonymous tips of further gambling activities at the club. Pursuant to this information, Trooper Deise and Corporal Singer visited the premises at approximately 2:15 a. m. on June 17, 1976. As in the May 21st entry, the troopers were not in uniform, lacked either search or arrest warrants, and were not club members. On this occasion, Corporal Singer entered the premises as part of a group of five other people who were unknown to him. Once inside, he proceeded to the bar, observed a punch board atop the bar, and then opened the front door for Trooper Deise. The latter immediately arrested appellee, Robert Weimer,[5] and confiscated pieces of the gambling paraphernalia.

The lower court joined the cases of Robert Weimer and John Edward Weimer to determine whether the secured evidence should be suppressed. The suppression judge held that the unannounced entry of the police into a club known to be private constituted, absent a search or arrest warrant, a constitutionally improper infringement of appellees' right of privacy. We cannot agree.

█ It is well established that when an officer sees contraband or other objects in plain view and has not intruded

4. 18 Pa.C.S. § 5513.

5. The arrest was again under Section 5513 of the Crimes Code. 18 Pa.C.S. § 5513.

into a constitutionally protected area, his observation is not a search within the meaning of the fourth amendment. *Commonwealth v. Murray*, 460 Pa. 53, 331 A.2d 414 (1975); *Commonwealth v. Cooper*, 240 Pa.Super. 477, 362 A.2d 1041, *vacated on other grounds*, 468 Pa. 390, 363 A.2d 783 (1976); *Commonwealth v. Getz*, 236 Pa.Super. 469, 344 A.2d 686 (1975); *Commonwealth v. Adams*, 234 Pa.Super. 475, 341 A.2d 206 (1975). Thus, while an officer is not forced to disregard that which is patently clear to him, the doctrine is only applicable when he is in a place where he has a legal right to be. *Commonwealth v. Murray, supra.* In the instant case, then, the essential issue is reduced to whether the interior of appellees' club was a constitutionally protected area and whether the officers had a legal right to be inside the premises when they observed the gambling paraphernalia and effected the arrests. If they had such a right, then their observation of the gambling paraphernalia was sufficient to form probable cause to arrest and seize the immediate evidence.

Any analysis in this area must begin with the tenets promulgated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). There, the United States Supreme Court propounded the now familiar doctrine that:

"[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [citations omitted]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [citations omitted]. *Id.* at 351–52, 88 S.Ct. at 511.

 In order for this constitutional protection to attach, however, the individual must harbor a *reasonable* and justifiable expectation of privacy within the area in question. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973). The reasonableness of one's expectations will necessarily turn on the facts in the individual case evincing the strength of that belief and the measures taken to ensure

privacy. One cannot envelope oneself with the cloak of fourth amendment protection while leaving gaping holes in the fabric.

In their brief, appellees point to *Commonwealth v. Soychak,* 221 Pa.Super. 458, 289 A.2d 119 (1972), as being indicative of the type of privacy here expected. In *Soychak,* the police received information that gambling operations were being conducted at a private billiards club. Acting on this tip, the police commenced a stake out of the premises, during which an officer stationed on the building's roof observed, through a louvered exhaust fan, the defendants attempting to destroy gambling paraphernalia. We affirmed the suppression of the evidence gained as a result of the observation, because even though the louvers were open, the defendants had a reasonable expectation of privacy with respect to the room's interior. It was necessary that the louvers of the exhaust fan be left open while the fan was in operation. Thus, the failure to close them did not negate the existence of an expectation of privacy. As we then stated:

> "[T]he defendants have in fact affirmatively demonstrated an expectation of privacy by their use of louvers which closed when the fan was not operating, their use of two reinforced doors, and their employment of a 'doorman'." *Commonwealth v. Soychak,* 221 Pa.Super. at 463, 289 A.2d at 122–23.

In contrast, the instant situation presents a much weaker expectancy. Although the buzzer system and one-way mirror militate in favor of an expectation of privacy, the actions of the club negate any such assumption. In neither the May 21st nor June 17th entry was the mirror used to identify the entrants. Indeed, the buzzer system appears to have been a precaution with no substance, since the troopers were admitted on the first occasion without any showing of membership. It would have been a simple matter to position a doorman at the outer door and to check the potential entrant and his identification through the mirror. This lax enforcement of purported security meas-

ures indicates that appellees' expectation of privacy was hardly reasonable or justifiable.

The instant situation is far more akin to *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970), *cert. denied* 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971). In *Hernley*, the suspects had failed to curtain the second floor windows in their home, thus allowing police who had climbed an adjacent tree to peer inside and obtain information leading to an arrest and conviction. Absent the obvious measure of curtaining the windows, we held that their expectation of privacy was neither justifiable nor reasonable. Similarly, in *Commonwealth v. Busfield*, 242 Pa.Super. 194, 363 A.2d 1227 (1976), state police officers observed incriminating activity through a suspect's window that was shielded only by a sheer curtain and an undrawn window blind. Again, it was patently unreasonable to assume that an expectation of privacy existed when only an insubstantial curtain was used rather than the available window blind.

Instantly, the club buzzer system is analogous to the sheer curtain, while the failure to employ a doorman mirrors the action of the *Busfield* suspects in not drawing the window blind. For all the owner and bartender knew, or apparently cared, the door might have been opening for a thief, a non-member, a uniformed officer, or, as in this case, a plain clothes trooper. Failing to take such a clear and obvious precaution, we cannot say that appellees exhibited a reasonable expectation of privacy.

Drawing from other jurisdictions, a situation similar to that *sub judice* was presented in *Gerard v. State*, 237 Ark. 287, 372 S.W.2d 635 (1963). In *Gerard*, the police received information that gambling operations were being conducted at a private club. Acting on this information, two officers in plain clothes, lacking either search or arrest warrants, sought admission to the club. Upon the doorkeeper's inquiry as to their membership, the officers only retorted, honestly, that they knew a bandmember. They were then admitted after payment of one dollar. Based upon their observations

within the club, the officers, after identifying themselves, made several arrests and seized various gambling paraphernalia as evidence. The Arkansas Supreme Court admitted the evidence and affirmed the arrests on the basis that the club, while purportedly private, was actually a *de facto* public one as a consequence of the lax enforcement of membership requirements. Although the evidence of nonenforcement was greater in *Gerard* than here,[6] the fact remains that appellees went to little trouble to ensure a right of privacy.

Moreover, assuming *arguendo* that the appellees entertained a reasonable expectation of privacy, we cannot agree that the entry was improper. The United States Supreme Court has long recognized that "[c]riminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer." *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820–821, 2 L.Ed.2d 848 (1958). *See also Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Andrews v. United States*, 162 U.S. 420, 16 S.Ct. 798, 40 L.Ed. 1023 (1896). Indeed, that Court has noted on numerous occasions that the government is entitled to use decoys and to conceal the identity of its agents. *See, e. g., Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). Absent such stratagems "it is all but impossible to obtain evidence for prosecution" in the enforcement of vice, liquor or narcotics laws. *Id.* at 210, n. 6, 87 S.Ct. at 427, *quoting* Model Penal Code § 2.10, comment, p. 16 (Tent.Draft No. 9, 1959). In *Lewis*, for example, an undercover agent received an invitation to a suspected drug dealer's home by misrepresenting himself as a buyer. After arrest, the suspect contended that the deception vitiated his consent to entry, but the court disagreed, noting that suppression of the evidence obtained through the visit would "come near to a rule that the use of undercover agents in

---

**6.** Of the fifty to sixty patrons of the club in *Gerard*, the record reflected that only two were club members. *Gerard v. State, supra* at 289, 372 S.W.2d at 637.

any manner is virtually unconstitutional per se." *Id.* at 210, 87 S.Ct. at 427.

This concept has been re-affirmed in a number of federal court decisions. *See, e. g, United States v. Glassel*, 488 F.2d 143 (9th Cir. 1973), *cert. denied*, 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). In *Glassel*, an informer and under-cover agent, insisting that they were legitimate drug buyers, were invited to the house of a drug dealer. Following consummation of the deal, while the agent remained in the house, uniformed officers descended upon the premises and entered the house without search or arrest warrants. With respect to the agent, the court concluded:

> "If he is invited inside, he does not need probable cause to enter, he does not need a warrant, and, quite obviously, he does not need to announce his authority and purpose." *United States v. Glassel, supra* at 145.

The intrusion of the other officers was permissible because the agent inside had authority to arrest, and they were merely insuring his safety and secrecy.

In the instant fact situation, opening the door with little regard to the identity of the entrants constitutes a clear invitation.[7] Once inside, the troopers did not effect a search, but behaved as any regular customers, merely observing the activity. Prior to admitting the uniformed

---

7. Instructive, but not determinative on this issue of entry by stealth is our recent decision that entry into a residence which is effected by ruse or deception in order to execute a search warrant is permissible if, once a person voluntarily opens the door, the police then announce their authority and purpose prior to entry and do not use force where exigent circumstances do not require it. *Commonwealth v. Regan*, 254 Pa.Super. 555, 386 A.2d 89 (1978), *allocatur denied* (filed August 31, 1978). It is clear that if the officers were executing a search warrant, they would be forced to announce their purpose and identity, absent exigent circumstances, prior to entry after the door is open. *See, e. g., Commonwealth v. Easton*, 231 Pa.Super. 398, 332 A.2d 448 (1975); *Commonwealth v. Fisher*, 223 Pa.Super. 107, 296 A.2d 848 (1972); *Commonwealth v. Riccardi*, 220 Pa.Super. 72, 283 A.2d 719 (1971). Because the present situation does not involve a search warrant, such a requirement is obviously inapplicable. Nevertheless, accepting the use of a ruse to execute a search warrant suggests implicit acceptance of the method to gain a consensual entry.

police, the troopers, having already observed enough evidence in plain view to support an arrest, identified themselves to appellees. The original entry leading to substantial plain view observation was consensual, with no physical breaking involved.

It is difficult, then, to condemn the police action. This is not to intimate, however, that we view the police procedure as wholly judicious. In the May 21st incident, the call requesting the assistance of uniformed police could have included a request for issuance of a formal arrest and search warrant. Further, in light of the results of this entry, and the information acquired in the interim, the troopers could have obtained warrants prior to the June 17th incident. Nevertheless, the applicable standard is not the ideal procedure, but that mandated by the law. In light of this, appellees not only had no reasonable expectation of privacy, but freely admitted the troopers into the club.

Accordingly, we reverse the order of the lower court suppressing the evidence and discharging appellees and remand the case for further proceedings.

JACOBS, P. J., dissents.

SPAETH, J., files a concurring opinion.

WATKINS, former P. J., and HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, concurring:

I concur in the majority's disposition, but only because I agree that appellees' conduct in admitting the police shows that they did not regard the premises as private. I disagree with the majority's extended *dictum*, that "assuming *arguendo* that the appellees entertained a reasonable expectation of privacy, we cannot agree the entry was improper." Majority slip opinion 6–7 *et seq.*