432 A.2d 1024

COMMONWEALTH of Pennsylvania, Appellant,

v.

Rose GINTER, Linda Collins, Carmen Charmello, Joseph Bianco.

Superior Court of Pennsylvania.

Argued Nov. 10, 1980.

Filed July 17, 1981.

10

Kathryn L. Simpson, Assistant District Attorney, Pittsburgh, submitted a brief on behalf of Commonwealth, appellant.

John Burkoff, Pittsburgh, for appellees.

Before HESTER, BROSKY and VAN der VOORT, JJ.

HESTER, Judge:

The Commonwealth of Pennsylvania brings this appeal from an order of the court below suppressing certain criminal evidence. For the reasons which follow, we will reverse.

The appellees have been charged with several violations of the Liquor Code [1] and criminal conspiracy.[2] The prosecution arose from an early morning raid by police officers upon a private social club—known as the Army-Navy-Air (ANA) Club—in the East Liberty section of Allegheny County. In August, 1979, officers of the City of Pittsburgh Police De-

1. Act of April 12, 1951, P.L. 90, as amended, 47 P.S. § 1–101 et seq.

2. Crimes Code, 18 Pa.C.S.A. § 903.

partment received information that the ANA Club was operating and serving liquor without a license as required by law. Officer Charles Murray and his partner conducted a surveillance of the club and observed numerous individuals enter and leave through front and rear doors. The building in question was two stories high with a restaurant on the first floor and the ANA Club above. The officers contacted agents Susan Galati and Gary Davis from the Liquor Control Board and, with the agents, conducted a further surveillance on the evening/morning of August 31/September 1, 1979. The lower court's opinion succinctly states the remaining relevant facts:

After watching the Club for approximately 45 minutes, L.C.B. Agent Susan Galati approached the rear entrance to the premises, consisting of a large, windowless locked steel door equipped with a buzzer system. One of the defendants herein, Mr. Carmen Charmello, was employed at the back door checking membership cards and identification. Agent Galati observed a blond male at the rear entrance who was denied admittance by the doorman after failing to produce appropriate indicia of membership and/or identification. Agent Galati then, managed to take up with a male Club member named Gary, who offered to take her into the Club as his guest. When questioned by the doorman, Gary indicated that Galati was with him, and the two proceeded up the stairs to the Second Floor Club entrance.

After Agent Galati entered the Club, Police Detective Murray and Agent Davis approached the front entrance which also consisted of a heavy locked steel door equipped with a buzzer system, consistent with the back door security system. There the two officers followed a group of three or four unknown individuals who rang the buzzer to gain admittance. Once inside, the group proceeded to the Second Floor front entrance where they were greeted by a doorman. While the unknown group of people were talking with the doorman, the two detectives drifted around them and entered the Club. Defendant Rose Ginter was

greeting people and welcoming them to the Club, and the detectives further observed liquor being served. The detectives went to the bar and joined Agent Galati where they ordered liquor, were served, and paid for their drinks. Defendants Bianco and Charmello were serving the drinks as well as defendant Linda Collins who was waiting on tables. The law enforcement officials did not observe a liquor license in the Club, but did see defendant Ginter enter a back locked room.

Opinion at 2–3.

At approximately 4:00 a. m., at a pre-arranged time, other officers entered the club and placed the appellees herein under arrest. Several bottles in the bar area were seized by Officer Murray, who then proceeded to magistrate's court to secure a warrant authorizing the search of the premises. Following this, the officers returned to the club and executed the warrant, seizing a number of incriminating items.

■ Pre-trial motions to suppress the evidence were filed by the appellees contending, *inter alia*, that the initial entry into the premises by the undercover officers violated the appellees expectation of privacy. Following a suppression hearing, the court below agreed with this argument and ordered all evidence seized to be suppressed.[3] In its opinion, the court focused upon the various security measures employed by the club—membership requirements, buzzers, windowless steel doors, peepholes, doormen—and the extent to which these measures were enforced. The court concluded that the club "did in fact erect and actively maintain a substantial security system designed to prevent nonmembers from gaining access to the club. As such, the defendants herein had a reasonable and justifiable expectation of privacy falling squarely within the purview of Fourth Amendment protection." Opinion at 6–7. For authority, the court relied principally upon our decisions in *Commonwealth v.*

3. Since the trial court's order effectively terminates the prosecution, the Commonwealth may properly appeal to this Court. *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963); *Commonwealth v. Davis*, 270 Pa.Super. 202, 411 A.2d 250 (1979); *Commonwealth v. Kazior*, 269 Pa.Super. 518, 410 A.2d 822 (1979).

*Soychak*, 221 Pa.Super. 458, 289 A.2d 119 (1972) and *Commonwealth v. Weimer*, 262 Pa.Super. 69, 396 A.2d 649 (1978) wherein we addressed the issues of whether a suspect's expectation of privacy was violated. In *Soychak*, officers on the roof of a building under surveillance peered through a louvered exhaust fan into a bathroom and observed incriminating behavior. The existence of the fan, two reinforced doors, and a doorman led us to conclude that "defendants exhibited a reasonable expectation of privacy [which was] unreasonably violated by the trespassory intrusion of the police officer." 221 Pa.Super. at 463, 289 A.2d at 123.

Closer to the facts of the instant case is *Commonwealth v. Weimer*, supra, which involved the investigation of a private gambling club, open to members only, with locked doors, buzzers, and one-way mirrors. Undercover officers gained entrance into the club simply by pressing a doorbell and being admitted. We found that while the elaborate security measures would suggest an expectation of privacy, "the actions of the club negate any such assumption." 262 Pa.Super. at 75, 396 A.2d 652. None of the security measures were in fact enforced, as the officers gained entry quite easily, and we concluded, "This lax enforcement of purported security measures indicate that [defendants'] expectation of privacy was hardly reasonable or justifiable" *id.*

Thus, the lower court instantly found that the various security precautions employed by the ANA Club were enforced, in contrast with *Weimer*, and that appellees' expectation of privacy was violated. However, in *Weimer*, we articulated an alternate holding in support of our decision to reverse the suppression order: "[A]ssuming, *arguendo*, that the [defendants] entertained a reasonable expectation of privacy, we cannot agree that the entry was improper. The United States Supreme Court has long recognized that '[c]riminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer.'" *id.*, 262 Pa.Super. at 75-6, 396 A.2d at 652-3. We went on to hold that the use of undercover officers to induce a consensual entry is not violative of the Fourth Amendment, even as-

suming the defendants possessed a reasonable expectation of privacy. We likewise find in the instant case that, assuming without deciding that appellees had a reasonable and justifiable expectation of privacy in the club, the officers and agents nonetheless did not transgress any constitutional proscriptions in affecting a consensual entry into the club.

Our analysis must begin with two United States Supreme Court cases decided in 1966 dealing with undercover agents and informer and misrepresentation of identity and purpose. In *Lewis v. U. S.*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), a federal narcotics agent telephoned the defendant, identified himself as "Jimmy, the Pollack", and inquired whether the defendant might sell him some marijuana. At the defendant's direction, the agent appeared at defendant's home, identified himself as Jim, and the alleged transaction took place. The court rejected Lewis' contention that the use of deception by the agent vitiated his consent to enter the home:

We were to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional per se. Such a rule would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest. A prime example is provided by the narcotics traffic.

The fact that the undercover agent entered petitioner's home does not compel a different conclusion. Without question, the home is accorded the full range of Fourth Amendment protections. See *Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Harris v. United States*, 331 U.S. 145, 151, note 15, 67 S.Ct. 1098, 1102, note 15, 91 L.Ed. 1399, 1406 (1947). But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a

car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

385 U.S. at 210–11, 87 S.Ct. at 427.

The court noted in a footnote, "Particularly in the enforcement of vice, *liquor,* or narcotics laws, it is all but impossible to obtain evidence for prosecution save by the use of decoys." *id.* at fn. 6 (emphasis added). As a limitation upon such police conduct, the court noted that in the absence of a warrant, an undercover agent may not conduct a general ransacking of the premises upon which he gained entry. See, *Gouled v. U. S.,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921).

*Hoffa v. U. S.,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) was decided the same day. There, the chief government witness, one Partin, had made frequent visits to Hoffa's hotel suite during the latter's trial on certain criminal charges. Hoffa related to Partin his ongoing efforts to influence and bribe members of the jury in order to gain a favorable verdict. Unknown to Hoffa, Partin was regularly reporting to federal agents Hoffa's endeavors to bribe jurors. Hoffa was eventually convicted of attempting to bribe the jury and contended before the Supreme Court that the government's use of Partin as an informer violated his Fourth Amendment rights. The court did not accept this argument, noting:

Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing.

Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. 385 U.S. at 302, 87 S.Ct. at 413.

In view of *Lewis* and *Hoffa*, our courts have sanctioned the use of a police ruse to gain entry into a home to execute a search warrant, where entry is peaceful and followed by announcement of authority and purpose. *Commonwealth v. Schaszberger*, 285 Pa.Super. 586, 428 A.2d 200 (1981); *Commonwealth v. McCarthy*, 257 Pa.Super. 42, 390 A.2d 236 (1978); *Commonwealth v. Regan*, 254 Pa.Super. 555, 386 A.2d 89 (1978). Similarly, courts of other jurisdictions have held that if an individual gives consent to another to intrude into an area otherwise protected by the Fourth Amendment, aware that he will thereby reveal to this person criminal conduct, the consent is not vitiated merely because it would not have been given but for the nondisclosure which made the consenting party unaware that the other person was a police officer or agent. Thus, in *U. S. v. Baldwin*, 621 F.2d 251 (6 Cir., 1980), an undercover agent gained employment as the defendant's chauffeur and general handyman and, in the course thereof, observed the defendant use and distribute cocaine on several occasions. On appeal, Baldwin argued that he never consented to a "police spy" in his home. The court answered:

> The Fourth Amendment, however, does not protect wrongdoers from misplaced confidence in their associates. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). On the contrary, an agent may legitimately gain entrance into a house by misrepresenting his identity. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966).
>
> 621 F.2d at 252–3.

■ The same rationale has been employed in cases where an agent appears at a drug suspect's home, represents himself as a prospective purchaser, and is invited in, thereafter participating in a drug sale. *People v. Nisser*, 189 Colo. 471, 542 P.2d 84 (1975); *State v. Roy*, 54 Haw. 513, 510 P.2d 1066 (1973). "It is well established that there is no unreasonable search when an undercover agent, posing as a willing participant in an unlawful transaction, gains entry by invitation and observes or is handed contraband." *Nis-*

*ser,* supra, 189 Colo. at 473, 542 P.2d at 86. This rule applies to a place of business as well. In *U. S. v. Enstam,* 622 F.2d 857 (5 Cir., 1980), undercover agents were in defendant's office under false pretenses and observed criminal behavior. The court rejected the appellant's Fourth Amendment argument, noting, "The mere fact that the agents concealed their true identity did not nullify defendant's waiver of Fourth Amendment rights. 'The agents did not see, hear, or take anything that was not contemplated and in fact intended by defendant as a necessary part of his illegal business.' " 622 F.2d at 868, quoting *Lewis v. U. S.,* supra, 385 U.S. at 210, 87 S.Ct. at 427. In a variety of other instances involving police ruse or deception in entering premises, the courts have held, relying upon *Lewis* and *Hoffa,* that "the Fourth Amendment affords no protection to the person who voluntarily reveals incriminating evidence to one who is a government agent in the mistaken belief that the latter will not disclose it." *U. S. v. Haden,* 397 F.2d 460, 464 (7 Cir., 1968) (agent posing as chemist); *Bickar v. Gray,* 380 F.Supp. 804 (N.D. Ohio, 1974) (agents posing as hippies); *State v. Anglada,* 144 N.J.Super. 358, 365 A.2d 720 (1976) (agents posing as home buyer in realtor's home); *U. S. v. Guidry,* 534 F.2d 1220 (6 Cir., 1976) (agent posing as sales representative of buyer company of printing press); *People v. Manieri,* 83 Misc.2d 798, 373 N.Y.S.2d 504 (1975) (agent posing as hospital porter).

We can discern no significant distinctions between the above cases and the instant case. The fact that Agent Galati misrepresented her identity as a guest of a club member does not vitiate the appellees' consent to permit her entrance. Similarly, Officer Murray and Agent Davis, entering the front door, silently presented themselves as club members or guests without actually showing identification cards and were greeted and welcomed by appellee Ginter as they reached the bar area. The officers observed no liquor license and were handed alcoholic beverages as all customers were. Such activity was part and parcel of the appellees' illegal business. See, *Lewis,* supra. The Fourth Amend-

ment does not protect the appellees' mistaken belief that these strangers would not reveal their criminal conduct. Indeed, the United States Supreme Court has acknowledged the need of undercover agents in the enforcement of liquor laws. *Lewis*, fn. 6, supra.

 Further, the fact that Officer Murray seized some bottles of liquor from the bar area without a warrant did not violate the Fourth Amendment. Murray did not engage in a general ransacking and rummaging, condemned in *Gouled v. U. S.*, supra, but rather conducted a limited seizure of a few items in plain view. Where an officer is lawfully upon a suspect's premises and properly in a position of observation, he may seize objects in plain view without a warrant. *Commonwealth v. Mitchell*, 489 Pa. 537, 414 A.2d 1021 (1980); *Commonwealth v. Harris*, 419 Pa. 131, 387 A.2d 869 (1978). Here, since we find that Murray was lawfully in the club pursuant to appellees' consent, the seizure was not illegal. A suspect is not "protected from the consequences of error if he places . . . physical evidence in plain view of government undercover agents." *Haden*, supra.

As a caveat, we stress that our decision does not condone police trickery and deception in all cases under all circumstances. Rather, we note our agreement with Judge Spaeth's recent observations in *Commonwealth v. Morrison*, 275 Pa.Super. 454, 418 A.2d 1378 (1980): "The problem of defining the limits to be set in the case of police deceptions is one of the most difficult problems in the criminal law . . . [T]he court should bend every effort to decide each case only on its own facts, never going further than it must, and never indulging in broad language that may be misunderstood and so encourage unwholesome practices", 275 Pa.Super. 454, 471, 418 A.2d at 1386, 1387. Today, we merely find that the cases we have studied do not prohibit the police practices here under scrutiny.

The suppression order is reversed and the case is remanded for further proceedings.

Reversed and remanded.