450 A.2d 1368

COMMONWEALTH of Pennsylvania

v.

**Hugh SWEEPER a/k/a Hughie Green, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 4, 1981.

Filed Sept. 24, 1982.

538

John W. Nails, Chester, for appellant.

Helen Kane, Assistant District Attorney, Media, for Commonwealth, appellee.

Before SPAETH, BECK and LIPEZ, JJ.

SPAETH, Judge:

This case rises on two appeals, which have been consolidated. Each appeal is from a judgment of sentence for engaging in a lottery in violation of 18 C.P.S.A. 5512. On the first appeal, Case No. 4224 below, we affirm. On the second, Case No. 5434 below, we reverse and award a new trial because the prosecutor's closing address exceeded the limits of propriety.

## Case No. 4224

On August 6, 1979, Sergeant Conway, the officer in charge of the vice unit of the Chester Police Department, received information that "Jane Doe," for whom the police had a warrant, had been seen at appellant's store at 1726 West 3rd Street in Chester. Acting on this information, Sergeant Conway and Officers Blythe and Jones drove past appellant's store, and saw a woman matching the description of Jane Doe standing outside. The officers parked their car and walked towards the store. Officer Jones entered first by following a man who knocked prior to entry. Inside the store he saw three men, including appellant. On the store's counter, nearest appellant, were four slips of paper and some cash. No one saw appellant take the cash, but the cash disappeared and Officer Jones, who was watching the other two men, testified that neither of them had touched it. After a moment or so, the other officers entered. Sergeant Conway looked at the slips on the counter and decided that they were "illegal lottery plays." N.T. 12/5/79, 59. One of the other officers told him that appellant "should have money in his pocket." *Id.*, 58. The sergeant "advised [appellant] that he was under arrest and had him dump his pockets out on the counter." *Id.*, 59. Appellant had $140.15. *Id.* The plays on the slips added up to $113. *Id.*, 97.

In questioning the sergeant at trial, counsel for appellant suggested that the slips on the counter were the work of a numbers player, not of a writer. *Id.*, 70 *et seq.* However, the jury resolved this issue against appellant. Appellant argues that the sergeant's admissions that "There could be another explanation for the duplications [of num-

bers on the slips] other than the fact that the possessor of those slips was a number writer" rendered the evidence insufficient, Brief for Appellant at 20, but despite some concessions, the sergeant remained firm in his opinion, and we think this issue too was for the jury. Appellant also argues that the evidence was insufficient "to show that [appellant] was the one in possession of the numbers," Brief for Appellant at 19, but again, given the evidence of appellant's proximity to the slips on the counter of appellant's store, we think this issue was for the jury, and that it was entitled to conclude that a lottery was in operation on appellant's premises and that appellant was engaged in it.

■ Appellant also argues that the "Jane Doe warrant" did not give the police authority to enter appellant's store. However, we need not consider the validity of the warrant.

It is well established that when an officer sees contraband or other objects in plain view and has not intruded into a constitutionally protected area, his observation is not a search within the meaning of the fourth amendment. Thus while an officer is not forced to disregard that which is patently clear to him, the doctrine is only applicable when he is in a place where he has a legal right to be. In the instant case, then, the essential issue is reduced to whether the interior of appellees' club [here, appellant's store] was a constitutionally protected area and whether the officers had a legal right to be inside the premises when they observed the gambling paraphernalia and effected the arrests. If they had such a right, then their observation of the gambling paraphernalia was sufficient to form probable cause to arrest and seize the immediate evidence.

*Commonwealth v. Weimer,* 262 Pa. Superior Ct. 69, 73–74, 396 A.2d 649, 651 (1978) (citation omitted).

Appellant argues, however, that his store was a "constitutionally protected area." In support of this argument, he asserts that "a special knock was required [to gain entrance]." Brief for Appellant at 16.

> In order for ... constitutional protection to attach ... the individual must harbor a reasonable and justifiable expectation of privacy within the area in question. The reasonableness of one's expectations will necessarily turn on the facts in the individual case evincing the strength of that belief and the measures taken to ensure privacy. *Id.*

Appellant's assertion that a special knock was required, and that that demonstrates his expectation of privacy, is belied by one of appellant's own witnesses, who testified that appellant was running a public store:

Q. Mr. Hughes, what were you doing in this place?

A. Well, we just hang out there, buy cigarettes and soda.

Q. How many people hang out there?

A. Oh, I couldn't tell you that. That's a public place a storefront.

Q. It is a public place?

A. Uh huh.

Q. Store front?

A. Yeah.

Q. What do they sell there?

A. Sold different things.

N.T. Suppression Hearing Jan. 3, 1979.

Even discounting the testimony of this witness, appellant failed to make out a reasonable expectation of privacy. In *Commonwealth v. Weimer, supra,* the defendant ran an illegal gambling operation in a hunting club. There was a one way glass in the front door to allow persons inside to see who was outside and a buzzer system to let people in. Two plain clothes officers entered without having to show membership by walking in with four people unknown to them. We dismissed the defendant's fourth amendment claim, saying:

> This lax enforcement of purported security measures indicates that appellee's expectation of privacy was hardly justified.

*Commonwealth v. Weimer, supra,* 262 Pa.Superior at 75–76, 396 A.2d at 652.

Similarly, in this case, appellant had no reasonable expectation of privacy in his store, when, if there was a requirement of a special knock, he made no effort to enforce it.

■ Appellant's remaining argument is that the slips and cash should have been suppressed as evidence because they were seized as a result of an illegal arrest. He argues that his arrest was illegal because it was a warrantless arrest for a misdemeanor but the police did not see the misdemeanor being committed in their presence. Brief for Appellant at 17–18. We are not persuaded by this argument.

As we have mentioned, Sergeant Conway, whose qualifications are not challenged by appellant, testified that the slips on the counter of appellant's store were the work of a writer. In explaining the relationship between a writer and a player the sergeant said:

> The writer will ask the player do you have a copy of the number that you are playing with me. If the writer doesn't have the copy or if the player doesn't have the copy of the slip that he is handing the writer, that's his only receipt, the writer will record the number plays and give him back his slip and keep the money. In certain instances a player will have a duplicate slip. He will note what he has played. Therefore he will tell the writer to keep the slip. That in turn is his ticket also. In other words, the next day if he hits [wins] he comes back and he produces a slip.

N.T. 92.

Officer Jones was entitled to believe that the slips were appellant's (for they were on his store counter and he was the person closest to them) and that the cash next to the slips had been put there by someone other than appellant (for why would appellant put his own cash on the counter?), and, further, that appellant had taken the cash (for it disappeared, and neither of the other persons in the store had taken it). When Officer Jones's knowledge is combined with Sergeant Conway's, the conclusion follows that the

police had probable cause to believe that appellant was at that very moment engaged in writing numbers.

## Case No. 5434

The police entered appellant's store a second time on October 9, 1979. Officer Bentley "walked inside with the crowds of people that were entering," N.T. 27; "[p]eople were coming and people were leaving," N.T. 28. Once inside the store he observed a "Mr. Gelis" handing a slip of paper and some money to appellant and overheard him tell appellant, "I want all of these for a quarter," N.T. 30, "straight for a quarter," N.T. 74. The officer "went to retrieve the paper" but Gelis "had snatched it back" from appellant. *Id.* When the officer identified himself, Gelis gave him the paper. The ofifcer, who was qualified at trial to give his opinion, examined the paper and noted 29 numbers written on it, and concluded that it had been "used to place a bet in an illegal lottery." N.T. 75. (He explained that the lowest bet that could be placed in the legal Pennsylvania lottery was fifty cents. *Id.*) The police later took $1,581.77 from appellant's person, and discovered three other slips of paper with numbers on them, also, in Officer Bentley's opinion, representing numbers bets.

. ■ Appellant argues that this evidence was insufficient to support his conviction, but the argument is without merit. *Commonwealth v. Polite,* 190 Pa. Superior Ct. 329, 154 A.2d 287 (1959). He also argues that the police entry of his store was illegal, but we have already considered and rejected that argument, in deciding his other appeal; the store was open to the public and appellant had no reasonable expectation of privacy within it.

Appellant also argues that the prosecutor's closing argument was improper. Appellant called two witnesses in his defense. They testified to the effect that they were present when the police arrived and that the only thing that happened was that Mr. Gelis entered the store with a slip of paper in his hand and the police took it from him. Both witnesses said that Gelis did not approach appellant or give

544

the paper to appellant. N.T. 190–91, 216. Also, both denied seeing any money or any other papers. N.T. 193, 218. During the prosecutor's closing argument, the following occurred:

MR. NAILS [defense counsel]: May I approach the bench?

THE COURT: Do you object?

MR. NAILS: Yes, Your Honor.

(Whereupon a sidebar discussion was held, as follows):

MR. DelBELLO [prosecutor]: My statement in sum was that the testimony of the defense witnesses was to the effect that there were, that there were no illegal bets, there were, in fact none of those documents were in the premises.

I said that if they believed that, if they accept that as true, then they should castigate me in essence for bringing a case that would be founded upon evidence fabricated by the police.

THE COURT: What is your objection?

MR. DelBELLO: I believe that.

THE COURT: What was your objection?

MR. NAILS: Your Honor, basically—

THE COURT: Do you agree that is what he said?

MR. NAILS: Something to that effect, Your Honor. And the statement prior to that was, there was another statement prior to that that was that they should call him a big fool.

MR. DelBELLO: Yes, I agree. I should be a fool to present that kind of testimony, perjured testimony.

MR. NAILS: Well, Your Honor, first of all, my objection is that basically he is telling the jury if they believe that, then they should get rid of him. And I just don't think that that's, you can ask the jury to make those kind of inferences.

It is basically telling them, you know, that they have to believe the police. And I just don't think—

THE COURT: Well, I don't see anything wrong with that kind of statement. Mr. DelBELLO is saying really, all that he said is look, you don't think that these people were there, and you believe that they were there, and I am simply asking you what are they doing here.

Are you saying—I mean, he is not saying don't believe them, don't believe the defense. He is not saying that the defense is a liar.

MR. DelBELLO: No.

THE COURT: But he is attacking the credibility. and—

MR. NAILS: Well, Your Honor, I don't object to—

THE COURT: I don't think that he has overstepped any bounds to be so prejudiced as to warrant—well, I mean, what would you want me to do?

MR. NAILS: Your Honor, I would ask for a mistrial at this point.

THE COURT: Well, that motion is denied.

We are unable to agree with the lower court's characterization of the prosecutor's argument. In our opinion, it was highly improper, and requires that a new trial be granted.

■ It is a long-settled, and often stated, principle that the prosecutor "may not express to the jury a personal belief as to the guilt or innocence of the accused." *Commonwealth v. Maloney,* 469 Pa. 342, 352, 365 A.2d 1237, 1242 (1976) (citations omitted). This principle derives from the nature of the prosecutor's office. Thus in *Commonwealth v. Bubnis,* 197 Pa. 542, 47 A. 748 (1901, the Court said:

It may be proper for us to say in this connection that, in his official capacity, clothed with the gravest responsibilities, and exercising functions in a measure judicial, the district attorney should ever be cautious in expressing to a jury his belief in the guilt of the accused. If convinced of it, his duty is to lead them to his own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other conclusion. "The district attorney is a quasi-judicial officer. He represents the commonwealth, and the commonwealth de-

mands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan:" *Com. v. Nicely,* 130 Pa. 261 [18 A. 737].

*Id.,* 197 Pa. at 550–51, 47 A. at 749–50 (collecting cases). *And see* ABA Standards, The Prosecution and Defense Functions 5.8 (Approved Draft, 1971).

In *Commonwealth v. Maloney, supra,* the prosecutor argued:

Here we have three eye-witnesses, and it's inconceivable to me, ladies and gentlemen, that you would have the circumstantial evidence and three eye-witnesses who saw the actual perpetration of the crime and then say it's not beyond a reasonable doubt. It's inconceivable to me that this would happen here in our country in this courtroom. It is. If it should happen, I just don't know. I'd probably lose faith in the judicial system. *Id.* 469 Pa. at 352, 365 A.2d at 1242.

In condemning these remarks as improper, and in awarding a new trial because of them, our Supreme Court made two points. The remarks were expressed in the first person singular, and thereby involved a statement of the prosecutor's personal opinion as to guilt. Furthermore,

not only do the remarks inject the district attorney's opinion and thus improperly add his experience and judgment to the issue of guilt, they also inject, as a deterrent to a finding of innocence, the idea that an elected district attorney will lose faith in our judicial system if guilty is not the verdict.

*Id.,* 469 Pa. at 353, 365 A.2d at 1243.

The Court cited and quoted with approval from *United States v. Schartner*, 426 F.2d 470 (3d Cir. 1970). There the prosecutor said, "I say to you with all the sincerity I can muster that if you do not convict the defendant, the guilty will escape." The Court of Appeals held that it "[could] not countenance these remarks."

> Not only do they imply a personal belief in . . . guilt, but they also indirectly invite the jury to rely on the Government attorney's experience in prosecuting criminals generally . . . . Neither the prosecutor's experience nor his moral integrity has anything to do with the evidence in the case.

*Id.* at 478.

■ The prosecutor's argument here was more egregious even than the arguments in *Commonwealth v. Maloney, supra,* and *United States v. Schartner, supra,* being expressed in more inflammatory language. By arguing that the jury should "castigate" him "for bringing a case that would be founded upon evidence fabricated by the police," and "should call him a big fool," the prosecutor expressed his personal belief in appellant's guilt in terms that could not be misunderstood; contrary to the lower court's observation, he precisely said "that the defense is a liar." In addition, he put his own integrity on the line, confronting the jury with the choice, either of finding appellant guilty, or of finding the police perjurers and him, an elected official, a "big fool" who had brought a case "founded upon evidence fabricated by the police."

It is of course true that not "[e]very unwise or irrelevant remark" compels the granting of a new trial. *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973), quoting from *Commonwealth v. Phillips*, 183 Pa. Superior Ct. 377, 382, 132 A.2d 733, 736 (1957); *Commonwealth v. Taliaferro*, 273 Pa. Superior Ct. 151, 417 A.2d 213 (1979). Here, however, as was said in *Commonwealth v. Maloney,*

> [S]ince the principal issue was credibility and since an opinion and a deterrent to crediting [the defendant's] testimony were injected, we cannot say beyond a reasona-

ble doubt that these factors did not [a]ffect the determination of credibility. See and compare, *Commonwealth v. Camm*, 443 Pa. 253, 277 A.2d 325 (1971) and *Commonwealth v. Henderson*, 456 Pa. 234, 317 A.2d 288 (1974). *Id.* 469 Pa. at 355, 365 A.2d at 1244.

The judgment of sentence in Case No. 4224 is affirmed.

The judgment of sentence in Case No. 5434 is reversed and the case is remanded for a new trial.[1]

---

**1.** Appellant also argues in Case No. 5434 that the lower court erred in allowing the prosecutor to argue that the jury could draw an adverse inference from appellant's failure to call a particular witness, and that the sentence was excessive. We do not reach these arguments.