THE STATE OF OHIO, APPELLANT, *v.* WILMOTH, APPELLEE.

[Cite as State *v.* Wilmoth (1982), 1 Ohio St. 3d 118.]

(No. 81-1334—Decided August 4, 1982.)

*Mr. Gregory A. White,* prosecuting attorney, and *Mr. Michael J. Scherach,* for appellant.

*Mr. James R. Willis,* for appellee.

*Per Curiam.* In *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [9 O.O.3d 81], this court held in its syllabus:

"1. In order for evidence to be seized under the plain view exception to the search warrant requirement it must be shown that (1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent to the seizing authorities.

"2. Where a police officer, in the course of executing a search warrant, discovers automobile body parts not described in that warrant, and harbors no more than a generalized suspicion that such parts have been stolen, the incriminating nature of the parts cannot be said to be 'immediately apparent,' and the seizure of the parts will not be upheld under the plain view doctrine."

The first paragraph of the syllabus in *Williams* restates the plain view test established by the United States Supreme Court in *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443. The court below applied this three-part test to the instant facts and determined that the state failed to satisfy the second and third parts of the *Coolidge* test.

After noting that "every vehicle in the parking lot was systematically searched," the Court of Appeals concluded that "[d]iscovery of evidence through such purposeful scrutiny cannot be termed inadvertent, especially when evidence of theft was the very thing being searched for. Although the vehicles themselves were in plain view, the specific evidence relied upon by the police in seizing the vehicles was not. It would be stretching the meaning of 'plain view' to say that items which could only be seen by opening the doors and crawling underneath the cars was [*sic*] in plain view."

The state would have us take an expansive approach to the plain view doctrine in disregard of the admonition in *Coolidge,* at page 466, that "the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." The fact that the police brought along an expert at least suggests that they intended a search more extensive than that authorized by the warrant. The expert was obviously not needed to inventory items clearly identified in the warrant. See Note, Criminal Procedure — "Inadvertence"; The Increasingly Vestigial Prong of the Plain View Doctrine, 10 Memp. St. L. Rev. 399, 408, at fn. 52 ("* * * to bring in 'trained eyes' for essentially no purpose other than to identify incriminating evidence circumvents the law and reinstates a general search warrant").

*United States* v. *Hare* (C.A. 6, 1979), 589 F. 2d 1291, upon which appellant relies, is distinguishable from the case at bar because the disputed evidence of narcotics in *Hare* was seized in connection with a search conducted pursuant to a warrant issued to uncover illegal firearms. In the instant case, however, the evidence at issue "was the very thing being searched for." Moreover, in *Hare* the court acknowledged a certain illogic in its position, which illogic underpins appellant's argument herein. The *Hare* court candidly stated, at page 1295, that "it may seem illogical to hold that police who lawfully enter premises and discover evidence which is not described in their warrant, in the course of a properly limited search, may not seize it if they *knew* they would find it before entering, but may seize it if they only thought they might find it, or if they discover it unexpectedly."

"Illogical" or not, appellant argues for the exceedingly broad, and for that reason questionable, definition of inadvertence enunciated in *Hare*. According to this test, anything that the police might discover while conducting

a search would be encountered inadvertently so long as the police did not have knowledge prior to the search of what they would find. Presumably then, a warrant would not be required whenever the level of suspicion falls short of actual knowledge, the evidence is visible to the naked eye, and the initial entry is lawful. This strained interpretation ignores the cautionary language of *Coolidge* and transforms a properly authorized and specific search warrant into an admission ticket that provides entry for the purpose of conducting a general search.

Paragraph two of the syllabus in *Williams* held that a "generalized suspicion" will not support a warrantless seizure under the plain view doctrine. In the case at bar, however, the police had nothing more to go on than a generalized suspicion. In its extensive recitation of the instant facts, appellant, unlike the court below, neglects to mention that "[t]he dashboard VIN's and license plates on both vehilcles [*sic*], which were in plain view, were checked out by computer and both came back as non-stolen." Nevertheless, the search continued, with expert assistance, until it became "immediately apparent" (in the eyes of the expert) that the evidence was incriminating. The state simply overlooks the implications of the expert's presence at the scene. This expert, in *Williams* terms, was "generalized suspicion" personified. The Court of Appeals in reviewing the record recognized as much and ruled accordingly.

In *Williams*, "we decline[d] to contort the plain view doctrine so as to justify the seizure * * * under review, since we would thus be allowing this narrow exception to the warrant requirement to swallow the rule." *Id.* at page 86. We are equally disinclined to contort the plain view doctrine in the case at bar and therefore affirm the judgment below.

*Judgment affirmed.*

Celebrezze, C.J., W. Brown, Sweeney and C. Brown, JJ., concur.

Locher, Holmes and Krupansky, JJ., dissent.

Krupansky, J., dissenting. In my opinion, the majority's decision unnecessarily restricts the ability of police officers to conduct an effective criminal investigation. I must, therefore, respectfully dissent.

A full understanding of the circumstances surrounding the case *sub judice* requires the following complete presentation of the facts:

On September 3, 1979, Officer Derwood Cunningham of the Elyria Police Department entered the premises known as Lucas Radiator, 718 Lowell Street, Elyria, Ohio, for the purpose of making a routine security check. The owner of the premises, Cecil Lucas, ran a radiator shop and garage on the premises and rented out two portions — one to a Don Kendall who ran an auto body business on the premises, and one to a John Wilmoth, appellee's brother, who also used the premises as an auto body shop. There were no rental arrangements regarding the parking areas on three sides of the premises, and

customers and tenants of all three businesses parked interchangeably on all three sides of the building. The premises were not barricaded at night, nor were there any "No Trespass" signs posted. Lucas testified he was aware the Elyria police officers entered his premises at night for security checks, and he had supplied the police with his home phone number in case of emergency.

In the early morning hours of September 3, 1979, Officer Cunningham observed several vehicles on the 718 Lowell Street premises which he believed to have been stolen. He returned again the next evening to check for a vehicle identification number (VIN) on one of the vehicles. Officer Cunningham then obtained a search warrant for the premises, listing a total of four vehicles and two truck frames on the warrant. The 1979 red Ford Granada and 1979 green and sand Ford pick-up truck, which appellee claimed he owned, were not described in the warrant.

On September 5, 1979, pursuant to the search warrant, Elyria police officers conducted a search of the 718 Lowell Street premises. Assisting them was William F. Lang, Special Agent with the National Automobile Theft Bureau (NATB).

Appellee was present at the time of the search, having arrived on the premises earlier in the 1979 green and sand Ford pick-up truck, one of the vehicles involved in this case. Both the 1979 green and sand Ford pick-up truck and the 1979 red Ford Granada were in the parking area of the premises. Agent Lang's inspection of these two vehicles, which included opening the doors of the vehicles to check the VIN numbers and crawling under the vehicles, together with Officer William Curtis' own observations, gave the officers reasonable cause to believe the vehicles probably contained stolen parts. As a result, the officers confiscated these two vehicles. Later investigation revealed they had both been rebuilt with stolen body parts.

Under the circumstances of this case, it is not at all surprising that before executing the search warrant, police officers had a generalized suspicion they might encounter other incriminating evidence. At that point, they already had probable cause to believe that the four vehicles and two truck frames which were named in the search warrant contained stolen parts. Thus, while they did not know in advance they would encounter other vehicles containing contraband, it was only natural for them to suspect the presence of criminal activity on the premises.

Their suspicions aroused, police officers enlisted the aid of an expert, William F. Lang, who had extensive experience and training in the detection of illegally rebuilt vehicles. Agent Lang had previously worked as an FBI agent for nearly 11 years and had nine years experience with the NATB. One of the functions of the NATB, which has been in existence since 1912, is to assist law enforcement agencies in the identification of vehicles when the original manufacturer's identity has been altered or obliterated. Agent Lang has attended numerous seminars and toured various automobile assembly plants and continues to do so in order to remain current on automobile manufacture procedures.

The majority characterizes Agent Lang as " 'generalized suspicion' personified" and criticizes the police officers for availing themselves of the benefit of "trained eyes" for the purpose of identifying incriminating evidence. In my view, however, the officers' decision to seek the assistance of an expert was sensible and prudent. The utilization by police officers of available resources, including the use of an expert who is capable of identifying probable contraband, would seem to me to be a praiseworthy objective, not one deserving of criticism. The majority, however, discourages efficiency and takes the nonsensical approach of finding fault with police officers who have the foresight to arm themselves with an expert who knows stolen parts when he sees them.

According to the majority, the plain view doctrine is inapplicable in the instant case because the officers did not discover the evidence inadvertently. An explanation of the inadvertency requirement of the plain view doctrine is set forth in *United States* v. *Hare* (C.A. 6, 1979), 589 F. 2d 1291, 1294, where it is stated: "* * * [I]f, in the course of such a properly limited search the officer comes across other incriminating evidence, which he did not *know* he would find and thus did not intend to seize, its discovery is inadvertent." (Emphasis added.) Thus, the inadvertency requirement is satisfied if, prior to the search, the officers did not have probable cause to believe the evidence would be discovered. While perhaps appearing on the surface to be illogical, the rationale underlying this requirement is, if the officers had probable cause prior to the discovery of the evidence, there would be no justification for failure to obtain a search warrant before seizing the evidence.

The facts here indicate that although the officers may have suspected they would encounter evidence other than that listed on the warrant, their suspicion was not sufficient to amount to probable cause to believe the evidence would be discovered. The record indicates the 1979 green and sand Ford pickup truck was not even on the premises at the time the warrant was obtained. Since the police did not know in advance that they would discover other incriminating evidence, and thus did not begin their search with an intention of seizing it, the evidence was inadvertently encountered in the course of an otherwise justified search. *United States* v. *Hare, supra.* Once the incriminating evidence was discovered, immediate seizure became necessary in view of the exigent circumstances, *i.e.,* due to the mobility of the automobile there is a strong likelihood of the evidence disappearing if police had to return at a later time with a second warrant. See, *e.g., Chambers* v. *Maroney* (1970), 399 U.S. 42; *Carroll* v. *United States* (1925), 267 U.S. 132.

The majority concludes the discovery was not inadvertent because the incriminating nature of the evidence became apparent to the officers only after "purposeful scrutiny," *i.e.,* only after Agent Lang opened the doors of the vehicles to check the VIN plates and looked under the vehicles. By assuming the officers' inspection of appellee's vehicles constituted a "search," the majority fails to recognize that the opening of a car door for the purpose of inspecting the VIN is not a search within the meaning of the Fourth Amend-

ment because the owner can have no reasonable expectation of privacy with respect to the car's VIN. *United States* v. *Polk* (C.A. 5, 1970), 433 F. 2d 644, 647. Similarly, the owner can have no reasonable expectation of privacy with respect to those portions of the interior visible through the windows, nor as to the exterior of the car, including the underside. This is so since "[a] car is not a home. An automobile runs and stops on the public roads, where viewers may crawl under it or press their faces against its windows. Its exterior and much of its interior are within the 'plain view' of the casual or purposeful onlooker, and thus are not protected by the Fourth Amendment from searching eyes." *Id.*, 647. Appellee's Fourth Amendment rights were, therefore, not violated when Agent Lang opened the doors of the vehicles and looked at the undersides because the incriminating evidence observed by the officers was in plain view in and on appellee's vehicles which were parked on a public parking area.

The majority cites *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [9 O.O.3d 81], for the proposition that a warrantless seizure is not justified when police harbor no more than a generalized suspicion that automobile parts have been stolen. The circumstances present in this case are, however, readily distinguishable from those present in *Williams*.

Unlike the officer in *Williams*, the officers here had the benefit of the judgment, experience and training of an expert. What is unremarkable in the view of the ordinary police officer may be immediately significant in the eyes of the trained expert.

In addition, there were numerous irregularities, not present in *Williams*, which led the officers to believe the vehicles contained probable stolen parts. These irregularities were observed on the exterior of the vehicles and on the interior when officers opened the doors to check the VIN plates, or were observable through the windows of the vehicles. As noted above, the officers' observation of these irregularities did not violate appellee's Fourth Amendment rights because (1) the opening of a car door to inspect the VIN plate is not a search within the meaning of the Fourth Amendment, and (2) there can be no expectation of privacy as to a car's exterior, nor as to those portions of the interior visible through the windows. *United States* v. *Polk, supra.*

Among the conspicuous discrepancies encountered, the record reveals the following with respect to the 1979 red Ford Granada: the federal pollution sticker was missing; the car was in the process of being rebuilt with parts from another vehicle of the same make as evidenced by several unmatched parts and mismatching of pinstriping and undercoating; the parts that were being reassembled all came from the same car as evidenced by things like the pinstriping and the type of undercoating which was consistent with the doors and front end; the vehicle was once in a stripped condition, *i.e.*, the four doors, the front end, the deck lid, the interior and probably the tires and wheels had all been removed from the Granada and were in the process of being replaced with parts from another similar vehicle; the rear small glass window was broken out; and the vehicle's ignition had been removed from the steering column. The majority notes, the VIN on the red Granada was checked out by

computer as not stolen; it was, however, found to be titled to another party and not to appellee, as he claimed. Thus, although the vehicles were not reported as stolen, as one of the officers testified: "* * * All of a sudden, they couldn't show ownership in any of the vehicles in question that we were finding. Nobody seemed to have titles to them; when we asked for them, they could not show ownership of them."

The evidence also included the following obvious irregularities with respect to the 1979 green and sand Ford pick-up truck: the VIN plate was not of factory installation; the VIN plate was bent and the rivets appeared to have been tampered with; the federal pollution sticker had been scraped off; the bolts attaching the cab, front end and bed to the frame had all been changed, *i.e.,* had been removed from one vehicle and placed on the truck; the VIN indicated a 1979 vehicle, but the truck frame was that of a 1978 vehicle; the seatbelt harnesses were that of a 1979 vehicle, and not belonging to a 1978 vehicle; and the VIN plate was insecure.

Based upon the above observations and the totality of the circumstances, it was immediately evident to the expert the vehicles constituted evidence that a criminal offense had probably been committed. The crucial difference between the *Williams* case and the case *sub judice* is that the officers in this case had more than a mere generalized suspicion. In the case *sub judice,* from a totality of the circumstances and the evidence in plain view there was certainly *ample probable cause* to determine these vehicles contained stolen parts. In *Williams,* the officer had only a generalized suspicion; whereas, in the case *sub judice,* the officers had probable cause.

It is, of course, well established the presence of probable cause along with exigent circumstances will support a warrantless seizure. The recent United States Supreme Court decision, *United States* v. *Ross* (1982), ____ U.S. ____, 72 L.Ed. 2d 572, adds impetus to this position. Once probable cause exists, police may conduct a meaningful search without a warrant even into closed containers within an automobile. In *Ross,* the court reinforced the distinction between searches of fixed premises, such as houses or buildings, and searches of movable vehicles; because automobiles can be moved quickly, in some circumstances, "an immediate intrusion is necessary if police officers are to secure the illicit substance." *Id.* at 4583.

Under the circumstances of the case *sub judice,* the Fourth Amendment did not require that the officers ignore patently incriminating evidence; rather, exigency necessitated the immediate seizure of vehicles which could have vanished easily if the officers had returned later with a warrant.

The seizure of the vehicles was justified under the plain view doctrine because: (1) the evidence was discovered during the course of executing a lawful search warrant; (2) the discovery of the vehicles was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent.

The majority's decision represents an unduly narrow interpretation of the plain view doctrine which needlessly shackles law enforcement officers in

their efforts to conduct effective criminal investigations. The majority, by its holding in this case, mandates that even though police officers inadvertently discover incriminating evidence in plain view, if the evidence is not encompassed within a search warrant, the police must turn their backs, ignore a crime being perpetrated and risk losing the evidence. I would, therefore, reverse the judgment of the Court of Appeals.

LOCHER and HOLMES, JJ., concur in the foregoing dissenting opinion.