THE STATE OF OHIO, APPELLANT, *v.*
TAUB ET AL., APPELLEES.

(No. L-87-218—Decided
March 11, 1988.)

*Thomas Secor,* for appellant.
*Jerome Phillips,* for appellees.

*Per Curiam.* This cause is before
this court on appeal from a judgment of the Lucas County Court of Common
Pleas wherein that court granted the
motion to suppress evidence of Leslie
A. Taub and Ron Swartz, defendants-
appellees. The state of Ohio, plaintiff-
appellant, filed a timely notice of ap-
peal asserting the following assign-
ments of error:

"First Assignment of Error:
"The trial court erred when find-
ing the defendants had standing to
assert Fourth Amendment claims.

"Second Assignment of Error:
"The plain view doctrine was not
properly considered by the trial court
since the court incorrectly found that
Detective Neipp's presence on the
premises was a trespass, and, his
subsequent discovery of the seized
evidence was anticipated."

On January 22, 1987, at approxi-
mately 11:15 a.m., Detective Sergeant
Fred Neipp received a telephone call
from the Lucas County Prosecutor,
Anthony G. Pizza, who informed him
that there was to be an "airplane"
pyramid sales meeting at 12:00 noon at
the Midas Muffler Shop at 1100
Monroe Street, Toledo, Ohio. Detec-
tive Neipp arranged for portable sound
recording equipment and organized a
group of fellow officers to act as a
back-up unit and watch the premises
from the street. There was no effort
made to obtain a search warrant.

Detective Neipp proceeded to 1100
Monroe Street, and in conducting
preliminary surveillance noticed an
eight and one-half inch by eleven inch
homemade sign in the window of the
Midas Muffler Shop which simply
stated "meeting" with a large arrow
pointing to a door several feet from the
main entrance. Detective Neipp saw
several individuals enter the building
through the other door which was
locked and unlocked for each individual

by a "doorman." Detective Neipp gained entry to the building by walking closely behind another person who had just come around the corner, making it appear that he was entering with this other individual. The doorman did not ask Detective Neipp for identification or deny him admittance. Detective Neipp entered peaceably, without force or objection from anyone. Detective Neipp admitted that no one ever expressly invited him into the meeting room or expressly gave his consent to his being present.

Once inside, Detective Neipp was greeted by appellee Taub, who shook his hand, welcomed him to the meeting, and offered him coffee and bagels. Thereafter, Detective Neipp went to the rest room where he activated a tape recorder hidden on his person. He then returned to the meeting room and mingled with the group of twenty-five to thirty persons, listening to and recording their conversations. Detective Neipp was approached several times by appellee Taub and others who kept asking his identity, occupation, and from whom he had received information about the meeting. Detective Neipp gave his true name, but did not reveal his true occupation, giving a former side occupation instead. Upon it becoming apparent that no one in the group had invited the detective to the meeting, he was specifically told that it was a private meeting and that he would have to leave. In being accompanied to the exit by appellee Taub, Detective Neipp identified himself as a police officer. Thereupon, most of the people at the meeting left and no arrests were made.

Before being asked to leave, Detective Neipp observed appellee Swartz standing behind a table upon which documents which Detective Neipp described as "airplane charts" were being worked on. Also on the table were a brown portfolio briefcase or letter file and a Purolator envelope which appeared to contain other documents. After everyone except appellee Taub had vacated the room, Detective Neipp confiscated everything on the table. Appellee Taub denied that the items were his, but protested their seizure. A short time later, the detective saw appellee Swartz and told him that if he wished the return of the items, the detective would meet him outside the building. Appellee Swartz did not meet the detective outside, but within an hour, counsel for appellee Swartz was in contact with Detective Neipp to demand return of the seized property.

On March 19, 1987, appellees were indicted by the grand jury and charged with violating Ohio's prohibition of pyramid sales plan or program, R.C. 1333.92 and 1333.99.

As a result of a hearing on a suppression motion, all of the seized property was suppressed. At oral argument before this appellate court, appellant conceded that the brown portfolio briefcase or letter file and Purolator envelope were properly suppressed. Appellant disputes only the suppression of the "airplane charts" which were lying in plain view on the table. Appellant contends that these items were in plain view and that appellees have no standing to raise a Fourth Amendment issue because they had abandoned the seized property.

The case turns on whether the initial intrusion was lawful or whether the detective was otherwise properly in a position from which he could view the particular area. *Texas* v. *Brown* (1983), 460 U.S. 730, 737. The abandonment and standing issues depend on the propriety of the initial entry of the detective. First, assuming the initial intrusion was lawful or the detective was properly in the meeting room, if appellees had abandoned the property, they had no standing and the

evidence could not be suppressed. If appellees had not abandoned the property, they had standing to object. The first prong of the "plain view" doctrine of *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443, would be met and the other two requirements would need to be dealt with.[1] If the initial intrusion was unlawful, then appellees cannot be deemed to have voluntarily abandoned the property and to have thereby lost their standing to object. "* * * [A] loss of standing to challenge a search cannot be brought about by unlawful police conduct. * * *" *United States* v. *Maryland* (C.A. 5, 1973), 479 F. 2d 566, 568, quoted in *United States* v. *Coleman* (E.D. Mich. 1978), 450 F. Supp. 433, 436-437. The first requirement of the "plain view" doctrine would not be met and, therefore, the evidence, not coming under any other exception to the warrant requirement, would be properly suppressed.

For the reasons derived from the cases which follow, this court finds that Detective Neipp's initial entry was lawful. Therefore, the second prong of the above discussion need not be dealt with.

The Supreme Court, in *Mancusi* v. *DeForte* (1968), 392 U.S. 364, at 367, stated that:

"* * * The Fourth Amendment guarantees that 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' * * * This Court has held that the word 'houses,' as it appears in the Amendment, is not to be taken literally, and that the protection of the Amendment may extend to commercial premises. See, *e.g., See* v. *Seattle,* 387 U.S. 541; *Go-Bart Importing Co.* v. *United States,* 282 U.S. 344; *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385."

As was stated in *Hoffa* v. *United States* (1966), 385 U.S. 293, 301:

"* * * What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion. *And when he puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure.* So it was that the Fourth Amendment could not tolerate the warrantless search of the hotel room in [*United States* v.] *Jeffers* [(1951), 342 U.S. 48], the purloining of the petitioner's private papers in *Gouled* [v. *United States* (1921), 255 U.S. 298], or the surreptitious electronic surveillance in *Silverman* [v. *United States* (1961), 365 U.S. 505]. * * *" (Emphasis added and footnote omitted.)

However, "* * * the Fourth Amendment protects people, not places. *What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.* See *Lewis* v. *United States,* 385 U.S. 206, 210; *United States* v. *Lee,* 274 U.S. 559, 563. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. * * *" (Emphasis added.) *Katz*

---

[1] The three prongs of the "plain view" doctrine of *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443, were succinctly set forth in *State* v. *Williams* (1978), 55 Ohio St. 2d 82, at 85, 9 O.O. 3d 81, at 83, 377 N.E. 2d 1013, at 1016, as requiring a showing that "* * * (1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent."

v. *United States* (1967), 389 U.S. 347, 351-352.

The United States Supreme Court, in *Lewis* v. *United States* (1966), 385 U.S. 206, 211, held that:

"* * * A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. * * *"

In *Lewis,* the occupant-defendant's contemplated purpose in inviting the undercover agent to his home was to execute a felonious sale of narcotics to the undercover agent and, the court held, "* * * [d]uring neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business. * * *" *Id.* at 210. The court denounced any authority on the part of an agent who gained entry by invitation to conduct a general search for incriminating materials, citing *Gouled* v. *United States* (1921), 255 U.S. 298. *Gouled* held unconstitutional a situation where a business acquaintance of the defendant, acting under federal officers' orders, deceptively obtained an invitation to enter a private office and then ransacked the office and seized certain private papers of an incriminating nature. The *Lewis* court also distinguished *Rios* v. *United States* (1960), 364 U.S. 253; *Jones* v. *United States* (1960), 362 U.S. 257; *McDonald* v. *United States* (1948), 335 U.S. 451; and *Johnson* v. *United States* (1948), 333 U.S. 10, on the basis that they "* * * all dealt with the exclusion of evidence that had been *forcibly* seized against the suspects' desires and without the authorization conferred by search warrants. * * *" (Emphasis added.) *Lewis, supra,* at 211.

In *State* v. *Pi Kappa Alpha Fraternity* (1986), 23 Ohio St. 3d 141, 23 OBR 295, 491 N.E. 2d 1129, certiorari denied *sub nom. Ohio* v. *Pi Kappa Alpha Fraternity* (1986), 479 U.S. 827, liquor agents deceptively gained invitation and entry to a fraternity house by fabricating their identity and expressly stating that the purpose of their visit was to examine the fraternity house on behalf of one of their brothers who was interested in joining the fraternity. While there, an agent asked and was granted permission by the house manager to purchase a can of beer from a "Coke" machine. The fraternity was later charged with, *inter alia,* selling alcohol without a permit. The court distinguished *Lewis* and found that the liquor agents were not invited into the fraternity house for the purpose of conducting illegal activity (*i.e.,* illegal sale of beer). *Id.* at 143, 23 OBR at 297, 491 N.E. 2d at 1131-1132. The court further found that the initial intrusion was not lawful because it was based on a lack of voluntary consent. *Id.* at 144, 23 OBR at 297, 491 N.E. 2d at 1131-1132. The consent to enter was for a lawful purpose, not to conduct illegal business. Hence, the court held, consent obtained through deception is not given freely and voluntarily, and entry based on such consent is not a lawful initial intrusion. *Id.* The court summed up its holding in the syllabus as follows:

"Pursuant to Section 14, Article I of the Ohio Constitution, and in the absence of any judicially recognized exception to the warrant requirement, government officers are not privileged to deceptively gain entry into the private home or office of another without a warrant, where such home or office is not a commercial center of criminal activity, and where the invitation to enter the private home or office was not extended by the occupant for the purpose of conducting illegal activities. (*Gouled* v. *United States* [1921], 255 U.S. 298; and *Lewis* v.

*United States* [1966], 385 U.S. 206, followed.)"

In *Hoffa, supra,* an old friend of Hoffa's was allowed to overhear certain conversations of Hoffa's. The old friend was, at the time of the conversations, a government informer. The conversations were used against Hoffa in a subsequent trial. Hoffa argued that the failure of the informer to reveal his role negated the consent Hoffa had given to the informer to be in the room and listen to the conversation. The Supreme Court rejected the argument and found no Fourth Amendment violation, reasoning that "* * * [the informant] was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that [the informant] would not reveal his wrongdoing. * * *" (Footnote omitted.) *Id.* at 302.

More recently, in *State* v. *Van Newhouse* (1987), 41 Ohio App. 3d 191, 534 N.E. 2d 1223, an assistant prosecuting attorney, an acquaintance of the appellees, went to the residence of the appellees under the guise of a social visit, but in reality, to determine whether a stolen glass art object was present. The appellees knew their friend's occupation. He was invited into the appellees' home and, upon entrance, observed the glass art object on top of the television set. With appellees' permission, he handled the object and observed the artist's inscription on its bottom. This court cited *Katz, supra,* and *Hoffa, supra,* and held that by displaying the glass art object in their home, appellees gave up their expectation of privacy and, thus, it was outside Fourth Amendment protections. "* * * Anyone coming into appellees' home would have been ex-

posed to this glass object." *Id.* at 193, 534 N.E. 2d at 1225.

In *State* v. *Anglada* (1976), 144 N.J. Super. 358, 365 A. 2d 720, the facts were succinctly stated at 360-361, 365 A. 2d at 721, as follows:

"* * * two narcotics investigators, pursuing a matter unconnected with either defendant, and attempting to ascertain the identity of occupants of a certain house, went to the local mayor's house for assistance. One of the defendants, later discovered to be the mayor's husband, answered the door. Because of the nature of his attire, and unaware at the time that the man was the mayor's husband, the investigators chose not to reveal their identities as law enforcement officials. Rather, after having been invited into the house to await the return of the mayor, they suggested to defendant that they were interested in purchasing a home in the immediate locale. During the course of the ensuing conversation inside defendants' home, defendant husband made several statements about the use of marijuana in the home by himself and his wife, and the general use of marijuana throughout the municipality. The investigators observed a pipe and rolling papers on the living room table in plain view. When the mayor returned home, the conversation continued and the investigators pursued their assumed roles because of the information imparted by the mayor's husband and the evidence of marijuana use they had observed.

"About eight days later, on July 10, 1974, one of the investigators, this time equipped with a concealed recording device, again visited defendants' home, again in the same assumed role. She was again invited into the home by defendant husband and once inside observed green vegetative matter which she believed to be marijuana. On speaking a prearranged code word,

other investigators entered the home and arrested defendant who, at the time of his arrest, was found smoking a marijuana cigarette. A search warrant was then obtained and a full scale search of defendants' home ensued. The marijuana plant was seized as a result of this warranted search. The codefendant wife arrived home shortly thereafter, and she was also arrested and charged."

The two were charged and convicted of possession and cultivation of marijuana.

The court rejected defendants' contention that "* * * their consent to the entry of the investigators into their home, procured as it was by deception, cannot be viewed as consent, and that the intrusion, unsupported by a duly issued warrant, and otherwise without probable cause, ran afoul of Fourth Amendment guarantees. * * *" *Id.*

The court emphasized that "* * * until the search warrant issued following the investigators' second visit to defendants' home, no search, within the normal meaning of that term, took place. *A search implies some exploratory investigation and prying into hidden places for that which is concealed. State* v. *Griffin,* 84 N.J.Super. 508, 517 [202 A. 2d 856] (App. Div. 1964). No activity of that kind preceded issuance of the warrant." (Emphasis added.) *Id.*

The court then discussed *Hoffa, supra; Lewis, supra;* and *Gouled, supra,* and held:

"Here, defendant[s] did not know that the intruders were police officers; indeed, that lack of knowledge is central to their argument. Consequently, they knew that they did not have to consent to their entry. *They chose to permit strangers to enter their home and chose to confide their unlawful activities to these total strangers.* Their exposure resulted, not from violation of principles pertaining to the sanctity of their home, but rather from their misplaced trust in persons about whom they knew nothing. Neither the Fourth Amendment nor the analogous provision of the New Jersey Constitution (N.J. S.A. Const. (1947), Art. I, par. 7) provides them with protection in those circumstances." (Emphasis added.) *Id.* at 363, 365 A. 2d at 722-723.

*Commonwealth* v. *Ginter* (1981), 289 Pa. Super. 9, 432 A. 2d 1024, has facts very similar to the case at bar. Police officers received information that the Army-Navy-Air ("ANA") Club was operating and serving liquor without a license. Surveillance was conducted and it was discovered that membership identification must be shown at the door before being allowed to enter. A female undercover Liquor Control Board agent approached the rear entrance where a male club member offered to take her into the club as his guest. She thus gained entrance to the club. Two other undercover officers approached the front entrance and gained entrance by following a group of three to four unknown individuals in and drifting around the group while the group members were talking with the doorman. The undercover officers were greeted and welcomed to the Club and they ordered and were served alcoholic drinks. The law enforcement officers did not observe a liquor license in the club. Thereafter, other officers entered the club and placed the defendants-appellees under arrest, while an officer who had previously entered the front entrance seized several bottles in the bar area. The Pennsylvania court held that the officers' "* * * entering the front door [and] silently present[ing] themselves as club members or guests without actually showing identification cards * * *" *id.* at 17, 432 A. 2d at 1028, were not unlawful and appellees' actions thereafter in serving the drinks were "* * * part and parcel of the ap-

pellees' illegal business. See, *Lewis,* supra. The Fourth Amendment does not protect the appellees' mistaken belief that these strangers would not reveal their criminal conduct. Indeed, the United States Supreme Court has acknowledged the need of undercover agents in the enforcement of liquor laws. *Lewis,* fn. 6, supra." *Ginter,* supra, at 17-18, 432 A. 2d at 1028.

The court also held that the limited seizure of some bottles of liquor from the bar which were in plain sight did not violate the Fourth Amendment, distinguishing it from the general ransacking and rummaging condemned in *Gouled,* supra. *Ginter,* supra, at 18, 432 A. 2d at 1028-1029.

In *Commonwealth* v. *Weimer* (1978), 262 Pa. Super. 69, 396 A. 2d 649, cited in *Ginter,* undercover officers, investigating a private, members-only gambling club with locked doors, buzzers, and one-way mirrors, gained entrance into the club simply by pressing a doorbell and being admitted. The *Weimer* court found that while the elaborate security measures would suggest an expectation of privacy, "* * * the actions of the club negate any such assumption. * * * [Since the officers gained entrance quite easily,] [t]his lax enforcement of purported security measures indicates that [defendants'] expectation of privacy was hardly reasonable or justifiable." *Weimer,* supra, at 75-76, 396 A. 2d at 652.

In the case *sub judice,* as in *Ginter,* supra, and *Weimer,* supra, Detective Neipp entered silently without being stopped or asked for identification by the doorman. Thus, Detective Neipp gained entrance by silently representing that he was invited to the meeting and that his purpose in attending was to be involved in the "airplane" pyramid sales scheme. This is distinct from the situation in *Pi Kappa Alpha,* supra, where the agents *expressly* misstated their true purpose which was a lawful purpose of touring the house in contemplation of a brother's joining the fraternity. The present case is analogous to the situation in *Lewis,* supra, where the purpose expressed, to conduct drug transactions, was illegal.

Detective Neipp did not attempt to conceal his presence; everyone in the room could see and hear him. Cf. *Katz,* supra (unlawful unwarranted electronic surveillance of telephone booth); *Silverman* v. *United States* (1961), 365 U.S. 505 (unlawful unwarranted spike mike in party wall adjoining houses). As in *Ginter,* supra, Detective Neipp was welcomed, asked who he was, and exhibited interest in being involved in the meeting and its illegal purpose. Detective Neipp saw the documents lying on the table. As in the situations in *Van Newhouse, supra; Anglada,* supra; and *Ginter,* supra, the evidence was visible to the naked eye — nothing had to be touched, opened or moved to see the documents. Cf. *Gouled, supra* (where defendant's office was ransacked); *Pi Kappa Alpha* (money had to be inserted into the "Coke" machine in order for the beer to appear). Not until *after* seeing the documents was Detective Neipp expressly told he was not welcome and would have to leave.

The next inquiry is whether a free and voluntary consent to enter was given to Detective Neipp by defendants-appellees.

Detective Neipp tried to appear to enter with someone, but an attentive doorman could have observed his presence and prevented his entrance. Detective Neipp was silent upon entering. Appellees did not prevent Detective Neipp's entry by having someone check everyone's identification or have them present a written invitation at the door. Detective Neipp did not conceal his presence in the room. He did not volunteer that he was a police of-

ficer. Appellees asked who he was, but not until after he had already entered. He was not immediately asked to leave upon giving an evasive answer as to how he knew about the meeting.

Detective Neipp did not *expressly* misrepresent his true purpose; he did not misrepresent that his purpose was a legal one. Cf. *Pi Kappa Alpha Fraternity, supra.* Detective Neipp implied that his purpose was the illegal one of "airplane" scheming contemplated by appellees. Accord *Lewis, supra* (drug transaction).

Thus, this court holds that it can be inferred from the circumstances that there was a free and voluntary consent to enter and therefore a lawful initial intrusion.

There being a lawful initial intrusion, there is no unlawful police conduct to prevent a determination that appellees Swartz and Taub voluntarily abandoned the "airplane charts" and thereby lost their standing to object. See *United States* v. *Maryland, supra; United States* v. *Coleman, supra.* This court determines that appellees did voluntarily abandon the "airplane charts":

"* * * The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, *left behind,* or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search [or the seizure]. United States v. Edwards, *supra,* 441 F. 2d at 753; *cf.* Katz v. United States, 1967, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576." (Emphasis added.) *United States* v. *Colbert* (C.A. 5, 1973), 474 F. 2d 174, 176.

First, appellee Taub lacked standing to object to the seizure because he expressly denied any interest in the seized property. As for appellee

Swartz, he was in immediate possession of the documents. He could have picked them up from the table and taken them with him when he left. Instead, he fled the meeting room without them and did not return to retrieve them. Such is the same situation which existed in *Colbert, supra.* In *Colbert,* the defendants were approached for questioning by police officers while walking down the street because one defendant fit the description of a wanted suspected felon. *Id.* at 175. When approached, the defendants set the briefcases they were carrying down on the sidewalk. *Id.* After a brief exchange in which the defendants disclaimed any ownership interest in the briefcases, the defendants began to walk away, leaving the briefcases on the sidewalk. *Id.* Thereafter, defendants were arrested for failing to carry a Selective Service registration certificate. *Id.* The briefcases were searched and discovered to contain sawed-off shotguns. *Id.* The defendants were indicted and convicted of possession of unregistered shotguns with illegal barrel lengths. *Id.* On appeal, the appellate court held that the trial court properly admitted the evidence because the defendants had abandoned the briefcases and therefore had no standing to object. *Id.* at 176-177. Accord *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 18 O.O. 3d 472, 414 N.E. 2d 1044, certiorari denied *sub nom. Freeman* v. *Ohio* (1981), 454 U.S. 822; *State* v. *Brown* (1984), 20 Ohio App. 3d 36, 20 OBR 38, 484 N.E. 2d 215; *United States* v. *Edwards* (C.A. 5, 1971), 441 F. 2d 749. Cf. *United States* v. *Sanders* (C.A. 6, 1983), 719 F. 2d 882.

Accordingly, appellant's first assignment of error is found well-taken.

Nevertheless, even assuming, *arguendo,* that appellees had standing to challenge the admission of the evidence, we reach the second and

third requirements of the "plain view" doctrine which are: "* * * (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent." *State* v. *Williams* (1978), 55 Ohio St. 2d 82, 85, 9 O.O. 3d 81, 83, 377 N.E. 2d 1013, 1016.

In reading *State* v. *Halczyszak* (1986), 25 Ohio St. 3d 301, 25 OBR 360, 496 N.E. 2d 925, and its syllabus, certiorari denied *sub nom. Halczyszak* v. *Ohio* (1987), 480 U.S. 919, it is apparent that the other two requirements of the plain view exception are met. The syllabus states:

"1. A *generalized expectation* by police officers that stolen autos or auto parts other than those specified in the search warrant might be found on the premises to be searched does not offend the 'inadvertent discovery' requirement of the 'plain view' doctrine.

"2. The 'inadvertent discovery' requirement may be satisfied when police lack antecedent probable cause, *i.e.,* an advance *particularized knowledge* of, or intent to seize, those objects ultimately seized.

"3. The 'immediately apparent' requirement of the 'plain view' doctrine is satisfied when police have probable cause to associate an object with criminal activity.

"4. In ascertaining the required probable cause to satisfy the 'immediately apparent' requirement, police officers may rely on their specialized knowledge, training and experience; and the presence of an auto theft expert at the scene of a lawful search does not offend the Fourth Amendment.

"5. *State* v. *Wilmoth* (1982), 1 Ohio St. 3d 118, and *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [9 O.O. 3d 81],

are hereby modified insofar as they are inconsistent with the following opinion." (Emphasis added.)

Detective Neipp had seen documents in connection with other pyramid sales schemes prior to entering the meeting room. He thus could, by merely viewing the documents without doing anything more, plainly associate the documents he saw on the table with criminal activity and meet the third requirement that the incriminating nature of the evidence be immediately apparent. "* * * [T]he mere act of viewing a VIN is not a search within the meaning of the Fourth Amendment so long as police are lawfully in a position to make the observation. * * *" Id. at 306, 25 OBR at 365, 496 N.E. 2d at 933. "* * * [A]n officer may rely on specialized knowledge and training 'to draw inferences and make deductions that might well elude an untrained person.'" Id. at 307, 25 OBR at 365, 496 N.E. 2d at 933, citing Texas v. Brown (1983), 460 U.S. 730, 746. The documents were the first and only items of an incriminating nature that Detective Neipp saw and seized.[2] Detective Neipp did not conduct "* * * a general exploratory search from one object to another until something incriminating at last emerge[d] * * *." Coolidge, supra, at 466.

The "inadvertent discovery" requirement is a bit more troublesome. However, inadvertence is necessarily intertwined with the lawfulness of the intrusion. If the detective was not allowed in, but instead had forced his way in, his view of the documents could not be said to have been inadvertent. Likewise, if he had ransacked the room, the discovery would not be inadvertent. In Van Newhouse, supra,

---

[2] The portfolio and Purolator envelope were admittedly not of an immediately apparent incriminating nature and were properly suppressed.

14

the assistant prosecutor received information that the glass art object might be at the defendants' house. Thus, he had a general expectation that the glass would be there, but until he went there and saw the object in plain sight on top of the television, he could not be said to have had particularized knowledge that the object would be at the place where it was seized. Accord *Halczyszak, supra,* at paragraphs one and two of the syllabus; and *Texas* v. *Brown, supra.* Had the assistant prosecutor gone hunting in other rooms, his discovery of the glass would not have been inadvertent: *Van Newhouse, supra.*

The same situation exists here. Detective Neipp received information that an "airplane" meeting was probably going to be held at 12:00 at the Midas Muffler Shop. He thus had a generalized expectation that items relating to a pyramid sales scheme might be present. He did not have particularized knowledge that the documents would be there. He did not go hunting and ransacking. His discovery thus was inadvertent.

Accordingly, appellant's second assignment of error is found well-taken. The "airplane charts" were improperly suppressed.

On consideration whereof, the decision of the Lucas County Court of Common Pleas is reversed as to the "airplane charts" which were lying in plain view on the table. This case is remanded to said court for further proceedings not inconsistent with this decision. Costs to abide final determination.

*Judgment reversed*
*and cause remanded.*

RESNICK, P.J., CONNORS and HANDWORK, JJ., concur.