OPINION
This case is before us on Lloyd Kemp's appeal from a conviction for carrying a concealed weapon. After the trial court overruled Kemp's motion to suppress, Kemp pled no contest and was sentenced to the maximum sentence of eighteen months. The sentence on the weapons charge was also imposed consecutive to a two-year sentence for a prior conviction in Montgomery County Case No. 1997 CR 3341.
In support of his appeal, Kemp presents the following assignment of error (quoted verbatim):
I. The lower court prejudicially erred in overruling the Defendant's Motion to Suppress and finding the seizure of the Defendant reasonable under circumstances where, solely acting on an anonymous tip relayed to the police through an unknown "managerial employee" that a black male in a club with 1200-1500 patrons, all but one black [sic] male in a fur coat with braids, had a gun, two police officers before midnight found the first two people fitting the description in the "packed" club, one of whom was the Defendant, and subjected him to a head to toe search with his hands in the air without finding any weapon and two hours later, one of the original searching officers told a newly arrived third police officer the original anonymous tip and the third police officer stationed himself at the exit of the club and seized the Defendant as he was leaving.
After considering the record and applicable law, we find the assignment of error has merit. Accordingly, the judgment of the trial court will be reversed.
 I
When we review trial court decisions on motions to suppress, we "`accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.'" State v. Satterwhite (1997), 123 Ohio App.3d 322, 323
(citation omitted). Since the relevant facts in the present case are largely undisputed, our focus is on the trial court's adherence to pertinent legal standards.
Kemp's arrest arose from information a police officer received to the effect that a black male with braids, and wearing a fur coat and body armor, was carrying a gun at a nightclub. In denying the motion to suppress, the trial court found that this information came from identified informants and was to be afforded a high degree of reliability. We disagree with this finding. Instead, we think the tip was from an anonymous informant. However, even if we assume that the identified informants supplied the tip, we would still find that the arresting officer lacked articulable, reasonable suspicion for a warrantless search.
The testimony at the suppression hearing revealed the following facts. On the evening of March 23, 2001, Dayton Police Officers, Michelle Barnett and Toni Hill-Spann were on overtime duty from 11:00 p.m. to 3:00 a.m. at a nightclub called "Your Place." The officers were in uniform, had a Dayton police cruiser on the scene, and were paid overtime by the City of Dayton to provide security at the club. Apparently, the City and Your Place had some type of contractual relationship for these services.
Officer Hill-Spann testified that someone from management told her and Officer Barnett that management believed that a couple of men inside the club had been involved in a shooting that took place a week before. Hill-Spann did not know where the person from management got this information. The management person described the men as black males who wore fur coats, had braids in their hair, and were "packing" (armed). Similarly, Officer Barnett testified that the manager said he had gotten information that two guys in the bar, both with braids, wearing fur coats, and armed with handguns, had been involved in a shooting a night or two before. After receiving this information, the officers walked through the club.
The club was packed that night. Estimates ranged from close to capacity (800) to over capacity (1,200 — 1,500 people). According to "Big Dog," who was head of security for "Your Place," there is only one entrance to the club. When patrons enter, they are throughly patted down for weapons. A metal-detecting wand is also used to find weapons, and anything that can be used as a weapon, including scissors and razors, is confiscated. The police witnesses testified that they did not see a wand being used that night. They also felt the searches were not particularly thorough — at least those they observed.
At about 11:30 p.m., the officers spotted two men who met the description. The officers then did a full-body search on the men and found that they were not carrying weapons. Both men did, however, have on body armor. Neither officer could specifically recall if she had searched Kemp. However, another witness identified Kemp as one of the two men who was searched. After the search, the officers left the two men and continued their security duties. There is no evidence that the officers received any further information or "tips" that evening about the men who were alleged to be armed.
Around closing time, additional police officers were dispatched to the scene due to a disturbance (a fight between females). Officers Lally and Morgan were among the officers dispatched. When Lally arrived, he first checked to make sure that Officers Hill-Spann and Barnett were all right. At that time, a large crowd was leaving the club. Officer Morgan told Lally that Officer Hill-Spann had gained information from the bar manager that a black male with braids and a fur coat was wearing body armor and carrying a handgun. After learning this, Lally went to the north exit door to see if the described individual came out of the bar. Lally was in uniform.
While Lally stood by the exit, he saw an individual (Kemp) approaching, who met the description. Kemp was wearing a fur coat, braids, and a sweater with a kind of strange bulge, about mid-chest. Kemp walked directly toward Lally, and Lally put his hand out to prevent a collision. When Lally put his hand out, he felt the bulge and could tell it was body armor. Lally then grabbed the bulge and asked Kemp what he had on under his sweater. Kemp did not say anything. At that point, Lally held on a little tighter. Kemp started to spin away and two other officers came to assist. However, Kemp wrestled himself out of his coat. His sweater then began to tear and he got away from the officers. Kemp began running, and when he got in the middle of the street, threw a gun on the ground. Shortly thereafter, Kemp was apprehended. He was subsequently charged with carrying a concealed weapon and with three counts of felonious assault in connection with the earlier shooting incident on Gettysburg Avenue. The latter charges were dismissed when Kemp pled no contest to the concealed weapons charge.
The above facts, with minor variations, were essentially not in dispute. After reviewing the facts, the trial court found that Officer Lally did not act on an anonymous tip; instead, he acted on information given to him by fellow officers and the club manager. The trial court concluded that these individuals were identified informants and should be afforded a high degree of reliability. Furthermore, the court felt that Lally was not required to question the officers and club manager before responding. In this regard, the court noted that Lally was responding to a disturbance call, "found a very crowded club with numerous individuals exiting, and was told by another officer that the club's manager had described an individual who was carrying a gun and wearing armor." The court found that "such a fast-breaking and potentially dangerous situation relayed from a known individual who would presumably be in a position to know the information which is told to police is sufficiently reliable for the police to act." Accordingly, the court decided that Officer Lally had reasonable grounds for making the stop.
The Ohio Supreme Court has addressed similar concerns in the context of police reliance on dispatches. See Maumee v. Weisner (1999),87 Ohio St.3d 295. In Weisner, the court observed that:
 [a] police officer need not always have knowledge of the specific facts justifying a stop and may rely, therefore, upon a police dispatch or flyer. * * * This principle is rooted in the notion that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." * * * When a dispatch is involved, therefore, the stopping officer will typically have very little knowledge of the facts that prompted his fellow officer to issue the dispatch. The United States Supreme Court has reasoned, then, that the admissibility of the evidence uncovered during such a stop does not rest upon whether the officers relying upon a dispatch or flyer "were themselves aware of the specific facts which led their colleagues to seek their assistance." It turns instead upon "whether the officers who issued the flyer" or dispatch possessed reasonable suspicion to make the stop. * * * Thus, "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment."
Id. at 297 (citations omitted).
Since Officer Lally did not speak directly to the informant, the present situation is analogous to cases involving dispatches. As the trial court implied, the police often do not have the luxury of time and must rely on information relayed by others. Consequently, the analytical approach used in Weisner is appropriate, even though a dispatch was not involved.
In Weisner, the court noted that where "the information possessed by the police before the stop stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip." Id. at 299. According to the court, highly relevant factors are: "the informant's veracity, reliability, and basis of knowledge." As a starting point, the class of informant should be identified. In this context, the court discussed three classes of informants: 1) anonymous informants, who are generally unreliable and require independent police corroboration; 2) known informants, i.e, persons from the criminal world who have given previously reliable tips; and 3) identified citizen informants, who have personally observed criminal conduct and are presumed to be reliable.Id. at 300.
As we said, the trial court in this case found that an identified informant was involved and accorded the information a high degree of reliability. We are not so sure that an identified informant was involved. Our reading of the transcript indicates that the actual source of the information was probably an anonymous informant. Specifically, Officer Barnett testified as follows:
 Q. Okay. And did a time ever come when either you or Toni Hill-Spann, to your knowledge, received some information relative to people in the bar.
A. Yes.
Q. Okay. Who received the information?
 A. Well, I was there also. The manager told us that he got information — I don't recall from whom or even if he said — but he said that there were two guys in the bar, both with braids, both wearing fur coats, that were packing or armed with handguns, and that they were allegedly involved in a shooting up on Gettysburg a night or two before.
Based on this testimony, it is apparent that the manager did not personally observe anything; instead, his information came from an anonymous third party. Therefore, we think the trial judge erred in finding that the source of the information was an identified informant.
In Florida v. J.L. (2000), 529 U.S. 266, 120 S.Ct. 1375,146 L.Ed.2d 254, the United States Supreme Court held that an anonymous tip that a person is carrying a gun, is not enough, without standard indicia of reliability, to justify a stop and frisk. Id. at 274, 120 S.Ct. 1380,146 L.Ed.2d 262. In J.L., the police received anonymous information that an individual, dressed in a certain way and standing at a particular bus stop, was carrying a gun. Id. at 268, 120 S.Ct. 1377,146 L.Ed.2d 258-59. Upon investigation, the police found the described individual standing at the specified location. He was frisked and was found to have a gun. However, the United States Supreme Court held that the evidence should be suppressed because the anonymous tip, alone, did not establish reasonable cause. The particular "standard indicator" mentioned in J.L. was accurate knowledge of a person's future movements, verified by police observation (also described by the court as "borderline" in terms of sufficiency). Id. at 271, 120 S.Ct. 1379, 146 L.Ed.2d 260.
We subsequently applied J.L. in a factually similar case, where the police received an anonymous call describing a particular person in a bar who was said to be carrying a concealed weapon. State v. Riley (2001),141 Ohio App.3d 409, 410. The police located the individual, as described, and upon frisking him, found a weapon. However, we concluded that the evidence should have been suppressed under J.L., and reversed the trial court decision. Id. at 411.
In our opinion, the present case is similar to J.L. and Riley. The fact that information was conveyed through an identifiable party does not change the result. Specifically, the actual source of information in either case is an anonymous party whose underlying knowledge and credibility cannot be tested. Moreover, the information itself, as received from the original "tip" was only that two people in the bar, wearing braids and fur coats, were carrying weapons. This is quite similar to the descriptions in J.L. and Riley, and offers no underlying basis for concluding that the tipster had inside knowledge.
Furthermore, even if we assume that the information came from an identified informant and that a presumption of reliability applies, the presumption was rebutted. As the Ohio Supreme Court stressed in Weisner, categorizing an informant as an identified citizen does not end the inquiry. Instead, it is simply "one element of * * * [the] totality of the circumstances review of this informant's tip, weighing in favor of the informant's reliability and veracity." 87 Ohio St.3d at 302. After making this observation, the Ohio Supreme Court went on to discuss the basis of the informant's knowledge as bearing on credibility. In this regard, the court noted that "[t]ypically, a personal observation by an informant is due greater reliability than a secondhand description."Id.
As we said, the manager in this case clearly did not make a personal observation. In contrast, the identified informant in Weisner called the police from a cell-phone and described the erratic driving of the defendant in great detail as it was happening. Id. at 295. Thus, the informant was giving essentially an eye-witness account. Again, the record in this case does not indicate that the manager actually saw anything.
Moreover, to the extent that Officers Barnett and Hill-Spann made actual observations, they tended to disprove the informant's tip. Specifically, when the officers found the two described men, they were searched and were found to be unarmed. From then until around 2:30 a.m. (a period of about three hours), the record is devoid of any further tips to or observations by the officers supporting a reasonable suspicion that criminal activity by these individuals was afoot.
Admittedly, the officers found body armor on both men when they were searched. As we noted earlier, the original description from the manager did not mention that the men were wearing body armor. Instead, they were described as two black males who were wearing fur coats, had braids in their hair, and were "packing." Therefore, the fact that body armor was found did not lend validity to the original tip, unless one concludes that wearing body armor is inherently connected to gun possession. On searching, the officers did see the body armor themselves. Again, this is only relevant if the presence of body armor indicates that an individual intends to engage in criminal activity.
The presence of body armor could mean that an individual has a gun or intends to engage in criminal activity. On the other hand, such items are also used as protection against injury, particularly in dangerous places. In this regard, we note that the head of security testified that he had seen five people killed in the club's parking lot. He additionally said that 10 to 12 people had on body armor that night, and that wearing armor was not unusual. Club patrons were also patted down and searched before entering — which is not the usual course of events at a nightclub. Finally, we note that a shootout actually took place in the club's parking lot that night, after Kemp was taken into custody. Given such circumstances, wearing body armor in this place of danger may simply have been a protective measure.
The difficulty with these cases, of course, is that the evidence found in the search corroborates the tip. For example, Kemp was, in fact, carrying a concealed weapon. However, in J.L., the United States Supreme Court rejected this type of analytical approach. Specifically, the court said that:
 [a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.
529 U.S. at 272, 120 S.Ct. 1379, 146 L.Ed.2d 261. Again, for the tip to be reliable, body armor would have to be closely related to illegality. However, there was no testimony to that effect, and we are not comfortable making that conclusion as a matter of law. Therefore, even if we analyze this case using the standards applicable to identified informants, we must find that the police lacked reasonable suspicion to stop Kemp and conduct a search.
We do note that Officer Lally observed that Kemp had a "strange bulge" in the middle of his chest (which later turned out to be a type of pocket). However, Lally did not say that he thought this was a weapon. Instead, Lally explicitly testified that the only reason he stopped Kemp and searched him was the information he had received from Officer Morgan. Accordingly, since the officers conveying the information to Lally did not have reasonable cause for suspicion, Lally's stop violated the Fourth Amendment. Weisner, 87 Ohio St.3d at 297.
In overruling the suppression motion, the trial court quoted from Statev. Wolf (March 2, 2001), Montgomery App. No. 18444, unreported, 2001 WL 220251, in which we remarked on the typical process of police investigation. Specifically, we said that:
 this case does not involve an anonymous informant. Instead, it consists of the kind of situation police officers encounter every day — they are dispatched to a particular location based on a citizen complaint, and then investigate the matter after they arrive, by speaking with the persons who made the complaint, or with bystanders who witnessed the particular event. Admittedly, Lavigne [the officer who conducted the search] did not speak directly to the complainants, but that does not turn them into anonymous informants.
2001 WL 220251, p. 3. We agree with these comments. However, we see a distinction between Wolf and the present case. In Wolf, the police were dispatched to an apartment about a dispute between two neighbors. The dispatch also indicated that the dispute may have involved a gun. When the officer who ultimately performed the search arrived, two other officers were already on the scene, talking to two people. The officer then went to stand in front of a building to see if anyone came out with a gun. While he stood there, he could hear some of the conversation, and heard that the person with the gun lived in the building he was guarding. Based on this information, he assumed the other officers were speaking to the people who had called in the complaint. Subsequently, an individual came out of the building being guarded, and said that someone had just kicked in his door. The officer then concluded that this individual was the other party in the dispute, frisked him, and found drug paraphernalia. Id. at 2.
After reviewing the facts, we found that the case did not involve an anonymous informant because the police spoke with identified individuals about the crime after they arrived at the scene. We then made the comment quoted above about the typical type of situation police encounter daily. We further noted that the officer conducting the search received independent corroboration after he arrived at the scene, connecting the defendant to the incident. Id. at 3. In contrast, no one in the present case witnessed a crime, the only actual observation (the first search) did not validate the informant tip, and no independent corroboration occurred thereafter. Consequently, our remarks in Wolf are not applicable.
In the present case, the trial court also focused on the fact that Officer Lally responded to a disturbance call, as part of a fast-breaking and dangerous situation. However, the disturbance call was not about a gun or the allegation that someone had a gun; instead, it was about some women who had gotten in a fight. Admittedly, guns could conceivably be involved in such a situation, but there is no indication that this was the case.
As a final matter, the State contends that Kemp has no standing to object to the search because he voluntarily abandoned the gun while being chased. The Ohio Supreme Court has held that "[a] defendant has no standing under the Fourth Amendment to the United States Constitution to object to a search and seizure of property that he has voluntarily abandoned." State v. Freeman (1980), 64 Ohio St.2d 291, paragraph two of the syllabus. Nonetheless, "`a loss of standing to challenge a search cannot be brought about by unlawful police conduct.'" State v. Taub
(1988), 47 Ohio App.3d 5, 7 (citations omitted). See also, Freeman,64 Ohio St.2d at 296, and State v. Fincher (1991), 76 Ohio App.3d 721,724-25.
As an example of how this doctrine works, the defendant in Fincher
dropped a pill bottle containing cocaine after being pursued by police.Id. at 723-24. However, because the investigative stop was unlawful, the court of appeals held that the defendant did not voluntarily abandon the bottle and lose his right to contest the search. Id. at 724. The court of appeals, therefore, held that the defendant's motion to suppress should have been granted. Id. at 726.
In the present case, Kemp was unlawfully physically seized and searched in violation of the Fourth Amendment. As a result, even though Kemp discarded the gun while being pursued, he did not lose standing to challenge the search.
Based on the preceding discussion, the single assignment of error is sustained. Accordingly, the trial court judgment is reversed, and this case is remanded for further proceedings.
WOLFF, P.J., and FAIN, J., concur.